CONSOLIDATED TANK LINE Co. *et al. v.* KANSAS CITY VARNISH Co. *et al.*

(*Circuit Court, W. D. Missouri, W. D.*   February 9, 1891.)

1. INSOLVENT CORPORATION—PREFERENCE TO DIRECTORS—FRAUDULENT CONVEYANCES.
   Directors of an embarrassed corporation, holding claims against it which they wished to protect, had the notes of the company payable to themselves drawn and antedated, and procured them to be discounted by defendant bank. They then caused to be executed a deed of trust conveying all the assets of the company as security for these notes, among others. *Held*, in a proceeding by unsecured creditors to set it aside, that, being a security for debts upon which the directors were themselves liable as indorsers, it was in effect a preference to themselves, and fraudulent and void.

2. SAME—NOTICE OF FRAUD.
   Nor is such preference valid as to another creditor, a corporation, on whose claim the directors were not liable as sureties, when it appears that the secretary thereof, who, as an attorney, was prosecuting its claim against the insolvent corporation, was employed to draw the deed of trust, and advised concerning it, and was fully aware of all the circumstances, and declined to act unless his client's claim was included in the security.

3. SAME—TRUST.
   As the directors of an insolvent corporation became trustees for the creditors, a bill to set aside as fraudulent a deed of trust of corporate assets to secure debts for which the directors are themselves liable as sureties need not show that the complainant has established his claim by judgment.

In Equity.

This is a creditors' bill on the part of the complainants and other creditors who may come in to set aside a deed of trust made by the Kansas City Varnish Company, a business corporation, preferring as creditors the German National Bank for $16,255, Harkness, Wyman & Russell, bankers, for $5,500, and the Kaw Valley Paint & Lead Company for $974.50. The deed of trust was executed August 25, 1890. The case, on preliminary hearing for writ of injunction and the appointment of a receiver, is reported in 43 Fed. Rep. 204. It has now been heard on the pleadings and full evidence. The principal facts will appear from the opinion of the court.

*Henry Wollman*, for complainants Tank Line Company and Heath & Milligan Manufacturing Company.

*Harwood & Meredith*, for National Linseed Oil Company and L. C. Gillespie, intervenors.

*Lathrop, Smith & Morrow*, for defendants L. V. Harkness, W. F. Wyman, L. D. H. Russell, William Peet, James W. White, and Charles N. Howard.

*J. L. Wheeler*, for defendants Kaw Valley Paint & Lead Company, Nellie F. Benton, and Robert E. Benton.

*Cunningham & Dolan*, for defendants Kansas City Varnish Company, O. H. Brown, and David C. Howey.

*Haff & Van Valkenburgh*, for defendants German American Bank.

PHILIPS, J. The question to be decided is as to the right of an insolvent business corporation to make a deed of trust for the benefit of certain of its creditors, to which debts the directors sustain the relation of indorsers, and especially whether the directors may thus prefer them-

selves when they know, or should know, that the corporation is insolvent, and the effect of the deed is to suspend the functions of the directors in the management of the entire assets, by turning them over to a trustee to dispose of summarily, when the fact is that the assets are barely sufficient to pay off the preferred creditors.  A brief review of the history of the debtor corporation will show that its business from the outset of its career was more or less fictitious, and its financial condition was never healthful and prosperous.  It was organized under the general corporation laws of the state of Missouri as a business corporation in 1886.  Its capital stock was $3,000.  The evidence shows that at least one of its subscribers, in violation of the statute, gave his note for his shares,—say for $800,—which has never been paid, and the subscriber is insolvent.  In January, 1887, an increase of stock was voted for $16,000, and in 1889 an additional increase to $30,000 was voted. From that time forth the company held itself out to the public as having such amount of capital stock.  It is true, as contended by counsel, that the statute did not require that this increment of stock should be actually paid up.  Yet the public deals with such concerns on the faith of such capital *in esse*, and it is that which chiefly gives it credit.  It is to be imputed to these directors and stockholders that they pretended and claimed all along that the stock subscribed by them was paid up, and it was among the difficult facts at this trial to develop how much had been paid, or rather how much had not been paid, and who are the delinquent constituents.  The only subscriber who did pay up his subscription is Mr. Benton, who was admitted on the nominal increase to $30,000, and he paid under the impression that others had done likewise.  The older stockholders, on the assumption that the concern was making money, claim to have in part paid up their stock in supposed dividends, and by charging the new takers with what they are pleased to term "the good-will of the company;" whereas, as a matter of fact, if a correct estimate of profit and loss had been timely made after the first year of its life, the fact would have appeared that the company had made no profit; and, although the fact was studiously concealed, and developed at this trial only after rigid inquiry, it further appears that, for so much of the increased stock as was not covered by the assumed dividends of profit and "good-will" of the concern, the subscribers, except Benton, executed their notes to the company.  These notes were then placed with the bank as collateral security for money borrowed by the company, where they remained for some time, when they were surrendered to the company and destroyed, or in some fashion made way with by the secretary.  While the debts represented by these stock notes constitute a part of the consideration of the very claim of the German American National Bank which this deed of trust attempts to prefer, by this device the directors so mingled their individual indebtedness to the company with that of the company to the bank that it is quite difficult on the proofs now made to determine the relative proportion; so that the directors by this deed of trust are not only attempting to protect themselves as indorsers of the company's paper, but to prefer debts owing di-

rectly by them to the company.    Such a transaction bears its own comment.

As might well have been anticipated, a concern aspiring to a business representing a capital of $30,000, with little over one-third paid up, if that much, without phenomenal success, found itself doing a strained, precarious business; and it is quite apparent from the developments at this trial that, but for the personality of its president, Mr. Peet, and the money he constantly advanced and borrowed on his indorsement, the unduly inflated concern would have collapsed long ago.    This is justified by the fact, as testified to by Mr. Peet, that when he could no longer, in justice to his other business operations, divert money therefrom, nor would longer obtain money from the bank for the varnish company, this deed of trust, or some similar resort, became inevitable. The evidence further shows that in the two years prior to January, 1890, the company had lost from $10,000 to $12,000,—a sum equal to its actual paid-up capital; that from June, 1889, to the time of making the deed of trust, August 25, 1890, the total amount of sales was $71,-818.81, while the expenses were $17,599.66,—equal to about 25 per cent.,—whereas the testimony of competent experts is that it should have made 25 per cent. on its sales, gross, to have sustained a successful business.

It is true, as much paraded by the secretary and directors on this hearing, that the company had credit in commercial circles such as would have enabled it to obtain goods on credit.    But this credit was predicated of a suppressed condition of its actual affairs.    It is not too much to say that no competent business man or house would have sold this company a dollar of goods on credit had it made known the true state of its capital and profits and losses.    It is true the company had credit at the banks, provided, however, that Mr. Peet, or other good surety, indorsed for it.

But the real question is, what was its actual financial condition just prior to the execution of this trust-deed?    In June and July it was unable to meet its maturing obligations.    Extensions were obtained in some instances by the well-phrased assurances of the secretary that he would soon be able to make payments.    He could make no collections on the motley character of its notes and accounts to meet these pressing demands.    Mr. Peet needed all the funds he could, with safety to his other enterprises, afford to borrow.    In August a crisis was imminent. The secretary, when urged by one of the creditors, promised that the directors would hold a meeting on the 22d to devise ways and means for raising money.    It had overdrawn its account in bank.    It gave checks on the bank where it had no money, which failed to pass the clearing-house.    It is idle now to pretend, as claimed by counsel, that, had a certain officer of the bank been present, those checks would not have been thrown out.    This is wholly problematical, and, had he so acted, it would have been in ignorance of the extreme condition of the company's affairs.    But the fact remains that its fictitious credit did not

avail it in the emergency culminating. This state of affairs doubtless impelled the president to call for an inventory to be taken, which was completed on the 23d of August. Owing to its limited deposits and lack of daily balances, the bank refused to give it credit shortly before this at a less rate of interest than 10 per cent., whereas it had, in common with other reputable business concerns, been obtaining loans at 8 per cent. interest. It had then in bank paper for about $17,000, drawing 10 per cent. interest. According to their ascertainment, the stock of supplies amounted to about $15,000, and, allowing a most liberal price for second-hand fixtures, $1,000 more might be added. These goods were inventoried by the receiver appointed by this court at $12,-500. And as best proof of its actual cash value, after the most earnest efforts of the receiver for months to make sale, the best price he could obtain was from Mr. Peet himself, at $8,700. But, grant that $15,000 was a reasonable apparent value, what else had this company? As shown by the receiver's inventory, there were in notes and accounts, in round numbers, $19,000, and in money turned over to him by the trustee on account of sales made by him after taking possession under the deed of trust, $626.48, making a total aggregate of $34,626.48. The amount of liabilities thus far disclosed were then, in round numbers, $35,000. This estimation of assets assumes that the bills receivable are collectible. Such, however, is not the fact. The secretary of the company himself, when requested by the receiver, on taking charge, to mark what were bad debts, good, and doubtful, at once marked over $9,000 as bad, and the court is justified from the evidence in concluding that not over 50 per cent. of the $19,000 can ever be collected; so that, accepting the valuation placed by the secretary on the goods, when he was under pressure to make as good showings as possible of his administration, and $24,000, or less, was what the company had to meet $35,000 of liability, and, as the sequel shows, not enough to meet the sum of the preferred debts.

It is suggested by one of the counsel that the amount of the unpaid capital stock owing by the stockholders should be added to the sum of the apparent assets. As a proposition of law, the unpaid stock is an asset,—a trust fund,—which the corporation holds for the payment of debts. _Hatch_ v. _Dana_, 101 U. S. 210. Invoking this liability now, in order to swell the assets at the time of making the deed of trust, the court may be permitted to suggest, in no offensive sense, however, that it would have come with more grace had the learned counsel and his clients assisted, rather than impeded, at the hearing the ascertainment of the true amount of this asset. On the contrary, whenever this matter was inquired into, the counsel interposed the objection that it is irrelevant, etc., to the issues on trial. On this account, the inquiry was not pressed to any specific ascertainment. But it does appear in evidence that perhaps not over two of these subscribers could be made to pay on judgment and execution. It is furthermore stated, over and over, by counsel for respondents, that the directors were ignorant of the true state of

the financial condition of this company; that they believed it was healthy, that its credit was good, and its assets ample to ultimately pay all the debts. Leaving out of view what the evidence on this hearing develops as to their actual knowledge of the insolvent condition of this company, we pause to say that nothing so marks the progress of equity jurisprudence in conserving the ends of justice as the now recognized principle that directors of corporations occupy a trust relation to the stockholders and the creditors of their company. They are expected, by the law, to do their duty as directors and trustees, and to have such knowledge of its affairs as diligence, fidelity, and honesty would disclose. If these directors did not know this concern was bankrupt, they should have known it. They did know its paper was being discredited at bank; they did know it owed $35,000 approximately; they did know what their own inventory showed; they did know it was losing money; and, when they were called together by its president on that 23d day of August, they then knew it was to take counsel as to what course should be taken in its dire extremity. They knew that there were but two roads open to them,—either to raise money on their own credit, and infuse new life into the sick concern, or to surrender its assets to its creditors. The instinct of self-preservation asserted itself, and mastered their sense of fair play. They resolved to take care of themselves by making a deed of trust, which preferred only the debts on which they were sureties. With all due respect to the personal character of the directors, the court is unable to credit the pretension, now set up by them, that they reasonably expected that by making such a deed of preference they would be better enabled to go ahead with the business of the corporation, and keep it "a going concern." They now say that the more conspicuous fact discovered by them on the result of the inventory and examination of the books was that they were overstocked with paints, and that their principal losses were traceable to the handling of this class of goods. Perhaps over one-half of the goods invoiced August 23d consisted of paints, brushes, etc. They now say it was their purpose in the action taken by them to merely get rid of the paints, and to limit their business in the future in the handling of varnish. How this desired consummation was to be wrought out by means of the deed of trust challenges common sense, provided there was no fraudulent collusion between the makers, the trustees, and the *cestuis que trusient*. The directors, when pressed on the witness stand, were utterly unable to give any plausible reason for this pretension.

The law, responsive to the practical maxim that actions speak louder than words, presumes that a man intends the natural and reasonable consequences of his acts. This deed of trust was given, ostensibly, to secure the payment of over $22,000 of debts. These could not possibly be discharged by the sale of the paints, aided by any possible expectation from collections on bills receivable. If such was the purpose of making the trust-deed, why did they not, at their conference on the 23d, resolve, and direct their own manager, to proceed at once to close out the paints, and then devise ways and means *aliunde* to meet their pressing debts? If

they were of the opinion that a trustee could better accomplish the desired result, why did they not authorize him to first dispose of this stock summarily, and provide for adding to and building up the varnish branch of the goods? The deed of trust itself, on the contrary, utterly refutes their assumption. By it they conveyed every particle of property they had, including the plant, and every instrumentality for a further prosecution of the business, to the trustee. Practically, they abdicated their functions as a managing board in favor of the trustee. They authorized and directed him to take immediate possession, and proceed to dispose of for cash the entire property, which could not reasonably be expected to pay off the preferred debts. In the entire absence of any arrangement made, or even suggested, by them to meet the unprovided for outstanding debts, amounting to say $13,000, they must, as reasonable, sane men, have anticipated that these creditors would not complacently and inactively stand by to witness the result of the Utopian idea of the directors for infusing new life into the suspended corporation. The unpreferred creditors would certainly be expected to take heroic measures to see that every dollar of surplus that might possibly arise from the trustee's administration should go direct to themselves, to say nothing of expected assault upon the deed of preference. Furthermore, the whole subsequent conduct of the directors contradicts the claim now set up by them. They were advised by their counsel, when they applied to him to draw up the deed of trust, that they could not prefer themselves. While we have not been fully admitted into the fullness of that inner consultation, it is quite inferable that this advice was predicated of the attorney's knowledge of the condition of the company's affairs. At that time, Mr. Peet, the president, had a claim against the company for $1,500, principal and interest, and Mr. White, another director, held a claim against it for, principal and interest, $1,225. To evade, as they conceived, the operation of the law which forbade a director from directly preferring himself as a creditor of an insolvent corporation, they had notes of the company drawn, payable to themselves, respectively, for these debts, antedated, which Mr. Peet took to the preferred banks, and had discounted on the indorsement of Peet Bros., his other business concern. Instead of paying over to Mr. White the amount of his note, Mr. Peet, from some unexplained cause, had the proceeds thereof placed to the credit of Peet Bros., where it yet remains. Whether this was a simulated arrangement between him and the bank, as it seems on its face, is not positively known. These notes were then put into the deed of trust as preferred debts to the banks.

Of like character, indicating unmistakably that the president and secretary regarded the company as hopelessly wrecked, at or about the time of making the deed of trust the secretary secretly turned over to Mr. Peet about $1,000 of notes and accounts of the company, which Peet appropriated to his own use, or at least they were withheld from the trustee and the receiver, and the fact was only extracted from Mr. Peet on cross-examination at this hearing. And, still further, it cropped out on trial that Mr. Benton, another director, about the time of the collapse, doubtless

for the purpose of avoiding responsibility of himself and wife as indorsers on the bank debts in question, conveyed, with his wife, valuable real estate held in her name at Omaha, Neb.; and on the day of the execution of the trust-deed the secretary was busy posting up the books of the company, giving credit for salaries of employes, and making various other entries, and the books show erasures changing dates and the like, as if to conceal the fact that they were made on that day. These acts indicate final administration, and by an administrator *de son tort.* As in the case of a sinking ship, they scuttled it, and the crew treated its cargo as common spoil. In the peril of the sea, the thought uppermost in their minds was self-preservation. Having, as they supposed, secured a day's provisions for themselves, each director struck out for himself. If they have done a single act to verify their pretension of a purpose to rescue the ship and continue the voyage, the evidence wholly fails to disclose it. Under any accepted definition of insolvency, this company, on the 25th day of August, 1890, was insolvent. All of its debts could not be collected out of its means. *Potter* v. *McDowell*, 31 Mo. 73. There was not a present ability of the debtor to pay out of its own means all its liabilities, nor sufficient property to respond on execution for such satisfaction. *Eddy* v. *Baldwin*, 32 Mo. 369. There was an inability to fulfill its obligations according to its undertakings, and a general inability to answer in court for all its liabilities, and with no reasonable assurance, in the usual course of trade, of recovering from its embarrassment. *Walton* v. *Bank*, (Colo.) 22 Pac. Rep. 442. The deed of trust was, in effect, a confession of insolvency. It conveyed all the company had to meet only a part of its liabilities. It virtually took away the ability— the means—of the directory to further prosecute the object of the franchise. While the corporate autonomy was not extinguished in law, it exists merely in a state of suspended animation, with no reasonable hope or assurance of resuscitation. When a corporation, in its business affairs, is thus *in articulo mortis*, whatever may yet be maintained on divided opinions as to its right to dispose of its property so as to give a preference to some general creditor, the law is too well settled, at least in this jurisdiction, to admit of extended discussion that its directors cannot make a disposition of the assets so as to secure to themselves, directly or indirectly, a preference over general creditors. This is the rule of the Missouri courts. *Williams* v. *Jones*, 23 Mo. App. 132; *Mill Co.* v. *Kampe*, 38 Mo. App. 229; *Roan* v. *Winn*, 93 Mo. 503, 4 S. W. Rep. 736. It is not too much to say that it is the established doctrine of the federal courts. It is strongly maintained by Judge THAYER in the eastern district of this state. *White, etc., Manuf'g Co.* v. *Pettes, etc., Co.*, 30 Fed. Rep. 865; *Adams* v. *Milling Co.*, 35 Fed. Rep. 433. See, also, *Lippincott* v. *Carriage Co.*, 25 Fed. Rep. 577; *Koehler* v. *Iron Co.*, 2 Black, 715–721; *Railroad Co.* v. *Howard*, 7 Wall. 392; *Oil Co.* v. *Marbury*, 91 U. S. 587.

In *Graham* v. *Railroad Co.*, 102 U. S. 161, Mr. Justice BRADLEY said:

"When a corporation becomes insolvent, it is so far civilly dead that its property may be administered as a trust fund, for the benefit of its stockhold-

ers and creditors. A court of equity, at the instance of the proper parties, will then take those trust funds, which in other circumstances are as much the absolute property of the corporation as any man's property is his."

The most recent discussion of this question is to be found in the very able opinion of Judge Woods, in *Howe* v. *Tool Co.*, 44 Fed. Rep. 231. I cannot better express the strength of the reason why a director should not be permitted to prefer himself, under circumstances like those under review, than by quoting his language:

"A sound public policy and a sense of common fairness forbid that the directors or managing agents of a business corporation, when disaster has befallen or threatens the enterprise, shall be permitted to convert their powers of management and their intimate, as it may be, exclusive, knowledge of the corporate affairs into means of self-protection, to the harm of other creditors. They ought not to be competitors in a contest of which they must be the judges. The necessity for this limitation upon the right to give preferences among creditors, when asserted by a corporation, may not have been perceived in earlier times, but the growing importance and variety of modern corporate enterprises and interests I think will compel its recognition and adoption. * * * Whether or not such preferences are fairly given, is an impracticable inquiry; because there can be, in ordinary cases, no means of discovering the truth, and consequently the presumption to the contrary should in every case be conclusive. Concede that it is a question of proof, and that a preference in favor of a director will be deemed valid if fairly given, and it may as well be declared to be a part of the law of corporations that, in cases of insolvency, debts to directors, and liabilities in which they have a special interest, may first be discharged. That will be the practical effect, and the examples will multiply of individual enterprises prosecuted under the guise of corporate organizations for the purpose, not only of escaping the ordinary risks of business done in the owner's name, which may be legitimate enough, but of enabling the promoters and managers when failure comes to appropriate the remains of the wreck by declaring themselves favored creditors. Besides inconsistency with that equality which equity loves, such favors involve too many possibilities of dishonesty and successful fraud to be tolerated in an enlightened system of jurisprudence."

The same thought was in the mind of Mr. Justice MILLER in *Sawyer* v. *Hoag*, 17 Wall. 620, when he observed:

"When we consider the rapid development of corporations, as instrumentalities of the commercial and business world, in the last few years, with the corresponding necessity of adapting legal principles to the new and varying exigencies of this business, it is no solid objection to such a principle that it is modern, for the occasion for it could not sooner have arisen."

It is insisted on behalf of the banks that, although the deed of trust may be voidable as against the directors, yet the banks are to be regarded as *bona fide* purchasers. But are the banks such purchasers? In the first place, they parted with nothing on the faith of the deed. They loaned the money, as their evidence shows, on the indorsement of the directors. They never asked for this deed. They did not know of its existence until after it was executed and recorded. They may be accorded the presumption of the law in their favor, that where such a deed is for their benefit, they are presumed to accept its provisions. But it is apparent on the face of the deed, and from the facts known to

the banks, that the deed inured to the benefit of the directors as indorsers of the notes held by the banks. The banks could not, therefore, take without being privy to the wrong attempted by the directors. If the law were otherwise, the rule would be of no avail which seeks to prevent such directors "from preferring debts in the payment of which they have a personal interest," as declared in *Adams* v. *Milling Co.*, 35 Fed. Rep. 435.

The next matter for determination is as to the claim of the Kaw Valley Paint & Lead Co. As the directors are not indorsers on this note, it is assumed by its counsel that, in order to avoid the deed as to it, the court must go to the extent of affirming the doctrine that an insolvent corporation cannot dispose of its property so as to prefer a general creditor. My opinion is that the courts of chancery ought to reach out for the attainment of a sound public policy which asserts that when a business corporation becomes so insolvent that it cannot further prosecute its business, and, to avoid an assignment or surrender for the benefit of all its creditors, it must, to avoid attachments or executions, make a disposition of its property to appease the demands of its creditors, the trustees, *eo instanti*, should be held to be trustees of the assets of the company for the equal benefit of all its creditors. But it is not essential to go so far in this case. That the Kaw Valley Paint & Lead Co. are chargeable with notice of three important facts, is satisfactorily deducible from the evidence: *First*, that when this deed of trust was executed, it knew, or had reason to believe, the debtor company was insolvent; *second*, that it probably could go no further in the prosecution of its business; and, *third*, that the Kaw Valley Paint & Lead Co. was privy to and participated in the fraudulent attempt of the directors of the debtor company to prefer themselves.

The evidence shows that John L. Wheeler was the attorney to whom the directors of the varnish company applied for counsel, and to prepare the deed of trust, on the 25th of August, 1890. He advised, *inter alia*, that they could not, under the law as he understood it, prefer themselves as creditors of the company. It was doubtless on this suggestion that Peet and White resorted to the subterfuge of discounting, ostensibly, the two notes held by them against the company to the banks, that the debts might appear in the deed as claims of the banks. These notes were drawn that day on blanks at his office, and were dated back. He knew they were then put in the deed of trust as preferred debts of the banks. At this time Wheeler was also secretary of the Kaw Valley Paint & Lead Co., and was acting as its attorney for the collection of its claim against the varnish company. He notified the directors of the debtor company that they must include his claim in the deed of preference if he drew up the deed. They so consenting, he drew the deed accordingly, antedating to the 15th of August the note of his company. Facts coming to the knowledge of an agent or attorney while engaged about the business of his agency are, in law, presumed to be known to the principal or client. *Hayward* v. *Insurance Co.*, 52 Mo. 181; *The Dis-*

*tilled Spirits*, 11 Wall. 356–367. In *May v. Le Claire*, Id. 217–233, the court observe:

"John P. Cook was counsel of Le Claire in all his transactions touching this property. He knew everything that was done, and his knowledge was notice to his client."

Again, any fact or circumstance connected with the transaction, calculated to excite his suspicion and put him on his guard, should prompt inquiry, and he is affected with notice of every fact which a prompt and diligent prosecution of the inquiry would develop. The conduct of the directors, the very character of the instrument they were executing, advised Mr. Wheeler of the fact of the financial extremity of the debtor company. His demand to have his company admitted to the preference, while creditable to his fidelity as the agent and attorney of his client and company, yet evidenced his apprehension of the debtor's critical condition. He could but see that the directors were anxious to protect themselves, and he was consenting to the endeavor, on condition that his opposition was silenced by a participation of his client in the undue advantage. So impressed was he of the extremity of the debtor and the exigency of the situation, that at much personal inconvenience, on a rainy night, he hunted up a clerk of the recorder's office, and induced him to accompany him to the office at 9 P. M., to place the deed on file, and at 10 P. M. had the trustee take possession of the store and goods. There was no purpose of the debtor company to admit the Kaw Valley Paint & Lead Co. to this preference, until practically coerced thereto by the suggestion of Mr. Wheeler; and there was a mutual consenting that the scheme of the directors might proceed on condition of the admission of the Kaw Valley Paint & Lead Co. to share in the preference.

These facts, in my opinion, except this case from the operation of the rule that a deed of trust or assignment may be good as to one or more of the named beneficiaries, and bad as to the others. The embracing of one creditor in this case was made to depend, in effect, on the admission of the other, whereby a fraud was attempted by both. The two acts were thus interdependent. In such case the deed is an entirety, and all the participants must stand or fall together. Where the acts of a party operate as a fraud, even though done without a fraudulent intent, he cannot be permitted to reap any benefit from them. *Clarkson v. Creely*, 40 Mo. 114.

It is finally insisted by counsel representing some of the respondents that the action must fail for the reason that complainants are not judgment creditors, and there has been no return of *nulla bona* on execution. Our view of this matter is expressed by Mr. Justice STRONG in *Case v. Beauregard*, 101 U. S. 688–691. Looking to the foundation upon which the rule contended for rests, it ought not to apply where judgment and execution would be fruitless.

"When the debtor's estate is a mere equitable one, which cannot be reached by any proceeding at law, there is no reason for requiring attempts to reach

it by legal process.  *  *  *  It may be said that, whenever a creditor has a trust in his favor, or a lien upon property for the debt due him, he may go into equity without exhausting legal processes or remedies.   Indeed, in those cases in which it has been held that obtaining a judgment and issuing an execution is necessary before a court of equity can be asked to set aside fraudulent dispositions of a debtor's property the reason given is that a general creditor has no lien.   And when such bills have been sustained without a judgment at law, it has been to enable the creditor to obtain a lien, either by judgment or execution.   But when the bill asserts a lien or a trust, and shows that it can be made available only by the aid of a chancellor, it obviously makes a case for his interference."

The question was considered and the authorities reviewed by the court of appeals in *Mill Co.* v. *Kampe*, 38 Mo. App. 234 *et seq.*, where it was held that a general creditor might maintain the action without first obtaining judgment, etc.   Rules of equity, or rather the application of equitable principles, must, in the progress of civilization, constantly expand to meet the intricacies of commercial transactions, and to circumvent the machinations and inventions of men to defraud justice of her rights.   Lord Chancellor COTTINGHAM held that it was the duty of a court of equity to—

"Adapt its practice and course of proceeding, as far as possible, to the existing state of society, and apply its jurisdiction to all these new cases which, from the progress daily making in the affairs of men, must continually arise."

And Judge Story observed:

"The beautiful character, pervading excellence, of equity jurisprudence is that it varies its adjustments and proportions so as to meet the very form and presence of each particular case in all its complex habitudes."   1 Story, Eq. Jur. § 439.

The legislature of the state of Missouri but sought to emphasize the province of a court of equity in enacting section 2790, Rev. St. 1889:

"The circuit court shall have jurisdiction over the directors, managers, trustees, and other officers of corporations now existing or hereafter organized under and by virtue of this article—*First*, to compel such directors, managers, trustees, and other officers to account for their official conduct in the management and disposition of the funds, property, and business committed to their charge; *second*, to order, decree, and compel payment by them to the corporation which they represent, and to its creditors, of all sums of money and of the value of all property which they may have acquired to themselves, or transferred to others, or may have lost or wasted by any violation of their duties or abuse of their powers as such directors, managers, trustees, or other officers of such corporation."

And by the succeeding section the court is authorized to appoint a receiver to carry out the objects of the law in the prevention of malversation by the directors.

It results that the prayer of the bill is granted, the temporary writ of injunction is made perpetual, the deed of trust is annulled, and the proceeds of the assets of the respondent company, in or coming to the hands of the receiver, will be distributed ratably, *pari passu*, among all the creditors of the respondent corporation whose debts may be properly

proved up, and the complainants and intervening creditors may take judgment against the respondent company for the amount of their debts respectively.

Decree accordingly.