MORRIS ABRAMSON *vs.* ALBERT N. HORNER
AND HARRY C. FOX.

*Deed in defraud of creditors; bill to set aside; proceedings in
county where land lies; subsisting and subsequent creditors.
Parties; persons not; may be bound by decree. Charges on
land; bills to enforce; Code of Pub. Gen. Laws, Art. 16,
sec. 83. Evidence; exceptions; erroneous rulings; when
no ground for reversal. Witnesses; examination be-
fore examiner; irregularity in Christian name,
etc. Fraud; questions of; latitude of evidence.*

Where a debtor purchases property, and has the deed made
out in the name of a third party, for the purpose of avoiding
subsequent creditors, the deed may be set aside and the prop-
erty sold, even though the complainant was not a subsisting
creditor.                                    p. 246

Where it appeared that a deed in default of creditors was
executed on November 29, and recorded on December 5, and
an action at law was brought by the complainant on Decem-
ber 4, on numerous notes of the fraudulent debtor, it may be
assumed that the complainant was a creditor at the time of
the execution of the deed.                    p. 246

In proceedings to set aside a deed made in fraud of creditors,
it is not necessary to make a party to the bill the person to
whom, in the furtherance of the scheme, the property was
first conveyed, when, before the suit was filed, the property
had been conveyed to third parties.           p. 246

When a person, who might have been a party and had full
knowledge of the proceedings, was a witness in the case, it
was *held,* that he was bound by the decree as effectually as if
made a party.                                p. 246

Under Article 16 of section 83 of the Code of Public General
Laws, proceedings to enforce charges or liens on land must
be instituted in the county where the land lies.    p. 246

A "charge" is a lien, encumbrance, or claim which is to be satisfied out of the specific thing, or proceeds thereof, to which it applies.    pp. 246-247

A bill to set aside a deed, on the ground that it is in fraud of creditors, is a claim to be satisfied out of the land in question or the proceeds, and the proceedings are properly instituted in the county where the land lies.    p. 248

Where an exception goes to the whole testimony of a witness, it can not be considered on appeal, if any of the testimony was admissible.    p. 248

Erroneous rulings of the trial Court on questions of evidence do not present reversible error, when the testimony would not have effected the conclusion of the Court of Appeals.    p. 248

In transactions involving fraud much latitude is allowed in the admission of evidence.    p. 249

The fact that the Christian name of the deponent was mis-spelled in the notice; that it does not appear that the formal question was propounded to the witness and an answer elic-ited thereon, and that the deposition is irrelevant and imma-terial, does not render it inadmissible where it appears that the right party was examined and that the objecting party was present and participated in the taking of the deposi-tion.    pp. 248, 249

*Decided April 4th, 1911.*

Appeal from the Circuit Court for Baltimore County (DUNCAN, J.).

The cause was argued before BOYD, C. J., BRISCOE, PEARCE, SCHMUCKER, THOMAS, PATTISON and URNER, JJ.

*R. B. Tippett* and *Robert Biggs,* for the appellant.

*T. Scott Offutt* (with whom was *John A. Timanus,* on the brief), for the appellees.

PATTISON, J., delivered the opinion of the Court.

The appellant in this case, being the holder of a judgment recovered against Albert N. Horner, one of the appellees, for the sum of three thousand two hundred eighty-three dollars and sixty-six cents ($3,283.66), filed in the Circuit Court for Baltimore County, sitting in equity, his bill against the appellees, Albert N. Horner and Harry C. Fox, praying therein that a deed from Jennie B. Hieatzman and husband to Harry C. Fox, one of the appellees, dated the 29th day of November, 1907, and filed with the bill as an exhibit, be set aside and declared void and the lands described therein he sold for the payment of the indebtedness aforesaid.

The bill alleges that the lands mentioned in the deed are the property of Albert N. Horner and that Fox has no interest whatever in them, and that the conveyance of them to Fox by Mrs. Hieatzman and husband was merely a scheme on the part of Horner to hinder delay and defraud his creditors, particularly the appellant. That Albert N. Horner has no property standing in his name, so far as the appellant has been able to discover after diligent research, from which the payment of the indebtedness aforesaid can be realized. That the claim upon which the judgment was recovered existed for a long time before the above mentioned conveyance of the lands.

Horner, in his answer, alleges that he has no "personal or specific knowledge" of the recovery of the judgment against him or of the conveyance of his sister, Mrs. Hieatzman, and husband to Fox, or of the interest of Fox in said lands, and therefore could neither admit nor deny the allegations of the bill in relation thereto. He denied that said lands belonged to him or that they had ever belonged to him, and further denied that the conveyance of the land to Fox was a scheme on his part to hinder, delay or defraud his creditors or any of them. He also denied that the claim upon which the judgment was recovered had existed for a long time prior to the conveyance aforesaid, and alleged that he had been

able at all times and was at the time of the filing of the bill able to pay all claims against him.

Fox in his deposition, taken under sections 17 and 18, Article 35 of the Code of 1904, stated that he was a resident of Waynesboro, Pennsylvania, and was at that time sixty-four years of age and a machinist by trade. That his wife was Horner's cousin, and that he was in Baltimore on the occasion of the execution of the deed from Mrs. Hieatzman and husband to him; that he went there at the request of Horner and is the party to whom Mrs. Hieatzman and husband conveyed the lands, and is the person who thereafter executed a mortgage thereon to Joseph R. Gunther. He testified that he did not pay anything for the lands, but was acting for Mr. Horner and had "no further interest than to oblige Mr. Horner." He could not recall whether he had, after executing the mortgage, executed a deed with the name of the grantee left blank, but when asked if the title to the lands still remained in him, he said "It does not"; he did not know, however, when he conveyed it, but it had been conveyed and this was done at the request of Mr. Horner. He could not recall whether he had executed a second mortgage on the property. He stated that he had repeatedly acted for Mr. Horner as grantee and mortgagor in relation to various properties in Baltimore and elsewhere when he had no interest in the same, "except expenses and anything that was given me for my trouble." That in the last two years prior to his testifying he had executed for Mr. Horner many deeds and mortgages relating to property in which he had no interest.

Joseph B. Sauter, the former owner of the lands, testified that he sold them for seven thousand dollars, of which the sum of forty-eight hundred dollars was paid by the certified check of Albert N. Horner delivered to him by one J. Wesley Evans, through whom the sale had been effected, and the balance thereof, the sum of twenty-two hundred dollars, was in a mortgage, resting upon the lands, held by one Reinhold. When the deed therefor was to be executed he was asked to

convey the property to Mrs. Hieatzman, which he did. He never knew or heard why he should have been asked to do so. This deed from Sauter to Mrs. Hieatzman was executed on the 26th day of July, 1907.

John Timanus testified that he acted for both Sauter and Evans, as well as for Mr. and Mrs. Reinhold, the mortgagees, in the sale and conveyance of said lands by Sauter. He prepared the deed to Mrs. Hieatzman, as directed by Evans. He did not know why Horner's check was used in part payment of the purchase money, but as the check was certified that did not bother him. Timanus also testified that he was one of the counsel for Horner in this case, although it does not so appear upon the record.

Joseph R. Gunther, an attorney of Baltimore City, testified that he was applied to by Evans in 1907 for a loan upon these lands. Evans, when he first applied, did not say for whom the application was made, but later, when asked who would execute the mortgage, he stated that he was making application for Albert N. Horner and produced the deed from Sauter to Mrs. Hieatzman, as well as other title papers. Evans stated, however, that the mortgage would be executed by Mrs. Hieatzman, that Mrs. Hieatzman was a sister of Mrs. Horner and "was holding the title as a matter of convenience for Mr. Horner." Gunther said he was afterwards told that Mr. and Mrs. Hieatzman had declined to sign the mortgage and that it would be executed by Fox. Mr. Gunther then prepared the deed to be executed by Mr. and Mrs. Hieatzman to Fox, as well as a mortgage from Fox to him as trustee. On the occasion of the delivery of the deed and mortgage and payment over of the consideration thereof, Horner, Evans and Fox were all present. The new mortgage was for twenty-six hundred dollars. After applying so much thereof as was necessary to the payment of the old mortgage with accrued interest and certain expenses that had been incurred by the filling of the mortgage for foreclosure, there was left of the consideration the sum of one dollar and ninety-six cents. This was paid by check drawn

to the order of Fox and handed him, which was at once
endorsed by him and delivered to Horner. He further testi-
fied that in the title papers handed him by Evans, there was
a deed executed by Jennie B. Hieatzman and husband of the
same date as the deed from Sauter to Mrs. Hieatzman. In
this deed the name of the grantee was left blank. Evans
explained why this was done by saying "It was executed in
that shape so that Mr. Horner could insert the names of such
persons as he saw fit." Fox executed the mortgage and
signed the notes upon being told to do so by Mr. Horner.

Robert Biggs, counsel for the appellant, in whose hands
the claim had been placed for collection, made careful investi-
gation of the land records to discover any property standing
in the name of Horner, but found none, nor was he able to
locate any personal property belonging to Horner. He found
upon the records debts owing by Horner amounting to at least
five thousand dollars in addition to the judgment of Morris
Abramson.

John Wesley Evans, who, as testified to by him, was an
examiner of mines, made an examination of the lands in dis-
pute to ascertain whether or not they contained asbestos and
found the property, as he thought, worthy of development
and secured from the owner, Sauter, an option to purchase
it. Not having the money himself with which to exercise
this option and to purchase the land he called upon Mr.
Horner to borrow it, but was told by him that he had no
money, but could get it from his sister, Mrs. Hieatzman.
The amount required was five thousand dollars in addition
to the mortgage resting upon the land. Horner gave Evans
his individual check for five thousand dollars, which was
delivered by him to Sauter in part payment of the purchase
money for the farm, and at his request the deed was executed
to Mrs. Hieatzman. That he had no personal knowledge as
to whose money it was, more than what was told him by
Horner. That in the purchase of this land it was agreed,
as he said, between Horner and himself that in the event
of a sale thereof he was to have one-half of the amount

received therefrom over and above the amount paid to Sauter therefor, and as he understood it, Mrs. Hieatzman was to have the other half, although he had no conversation with Mrs. Hieatzman previous to the conveyance to her. That he had never met Fox until he came to Baltimore to execute the mortgage; that his name was first mentioned to him by Horner. He admitted that he had applied to Mr. Gunther for the loan in the name of Mr. Horner, and further stated that the interest accruing on the mortgage while held by Mr. Gunther was paid by him to Mr. Gunther with money furnished him by Mr. Horner.

Horner testified that the money with which the land was purchased was the money of his sister, Mrs. Hieatzman. That he furnished this money in order to make some money out of it for his sister, as well as to protect Evans. That later the parties holding the mortgage upon the lands were about to foreclose it and it became necessary to place a new mortgage upon the property in order to raise the amount with which to pay off the old one. That he did not like to ask his sister to ask her husband to join in a mortgage for her benefit when her husband had no mortgage on his own property. It was for this reason that the land was conveyed to Fox in order that he might execute the mortgage. Accordingly, he sent for Fox, a widower, and had him come down from Pennsylvania and make the mortgage. The old mortgage was paid off and Fox immediately re-conveyed the property to Mrs. Hieatzman. This last named deed, dated November 29th, 1907, and acknowledged December 5th, 1907, was not at that time placed upon record, nor was it recorded at the time Horner was testifying. He stated that the reason for not placing it upon record was that it was good between the parties and "not being an absolute necessity, I did not think it worth while to do so, and when the suit was commenced I couldn't." It was, however, subsequently on the 15th day of May, 1909, recorded and was placed in evidence while the appellee was still upon the stand as a witness. Upon cross-examination, he stated why it was not placed

upon record was because "We wanted money to put up the place and we might want to put another lien on it for that purpose". By "we", he stated, he meant Evans and himself. He admitted giving his individual check, but stated that it was money of his sister, Mrs. Hieatzman, money that he had borrowed on her collateral. He denied the existence of the deed executed by Mrs. Hieatzman and husband with the grantee's name omitted therefrom, as testified to by Mr. Gunther. He further testified that he has always been able and is now able to pay all proper claims against him if he could collect what is due him. When asked what claims were due him, he named quite a number of long-standing claims which he had attempted to collect, but had been unsuccessful in so doing, and when pressed to do so, could not name any other assets belonging to him. He could not recall any mortgage executed by Fox after the execution of the Gunther mortgage, and did not think Fox would execute such mortgage unless so directed by him. When asked, he said the check given in payment of the farm was drawn, he thought, upon "The Fidelity", and that the collateral upon which the money was borrowed was the bonds of the Condon-Lane Boon Lumber Company, which his sister had gotten from her father's estate, of which he was executor. That although his father died in 1883, the estate has never been settled; that he has never filed an inventory and that nothing will appear of record showing the ownership of this stock in his sister. His attention was then called to an attachment proceeding instituted in the Court of West Virginia in which the stock of one Condon was attached by Lipscomb, wherein Horner intervened by petition so late as 1898, claiming the stock as attached in the name of Condon to be his property. The case, however, was decided adversely to his claim, and on appeal to the Supreme Court of West Virginia the lower Court was affirmed. Horner could not recall any of these facts, although the petition, parts of the answer and the opinion of the higher Court were read to him. When asked if the hypotheacated bonds were not the bonds obtained by

him in exchange for twelve hundred and fifty shares of pre-
ferred stock, he replied: "They were in the deal". In his
testimony given in June, 1909, Horner stated that the mort-
gage given by Fox to Gunther had recently been paid off.
The record discloses that this mortgage when paid off was
assigned to the counsel of the appellee in this case, Timanus,
as attorney, and thereupon filed by him for foreclosure and
the property advertised to be sold thereunder on the first
day of March, 1909. Whereupon an injunction was issued
upon the application of the appellant enjoining the sale of
the property under said proceedings. When upon the stand
Horner was asked: "Who furnished the money to pay off the
Gunther mortgage? A. Ask Mr. Timanus that question, that
is his business. Q. I prefer to ask you. A. I decline to
answer Mr. Timanus' question. Q. Did you not give the
money to Mr. Timanus? A. I did not. Q. Do you mean
to say that you do not know where Mr. Timanus got the
money? A. I mean to say that I did not give him that
money. Q. I ask a direct answer to my question; do you
mean to say you do not know where Mr. Timanus got the
money? A. I mean to say that I did not give him the
money, what I got from Mr. Timanus is hearsay. Q. I ask
you again to say whether or not you do not know where Mr.
Timanus got the money? A. I decline to answer. Q. Did
you co-operate with Mr. Timanus in getting the money?
A. I did. Q. Where did you get it? A. From my sister's
money." That it was money in his, Horner's hands com-
ing from the setttlement of some business transaction in
which she was interested in Virginia. On re-examination,
however, he stated that it was the estate's money. In response
to a notice served upon him to produce the books showing
the transactions between him and his sister during the years
1896, 7, 8 and 9, he replied by saying that he never kept a
cash book, ledger or any kind of books at all. When asked
of what the estate of his father consisted at the time of this
death, he stated that it was utterly impossible for him to

recollect, that all papers and memoranda were burned in the fire of 1904.

Mrs. Hieatzman, sworn on behalf of her brother, the appellee, testified that she resided in the City of Baltimore, was a sister of the appellee, did not know whether she knew Fox or not. When asked to state whose money it was that went into the purchase of the Sauter property, replied by saying Mr. Horner told· her that he had bought the farm for her, that he had bought it with her money. This was a few days or a week after the purchase had been made. When asked from what source the money came she said: "Money from an undivided estate, as I understand it; it was no money that I had given Mr. Horner." The estate to which she referred was the estate of her father. That her brother, the appellee, managed the money belonging to her and made· investments· for her from time to time without consulting her, telling her of it afterwards. That she conveyed the property to Mr. Fox in order that a mortgage might be placed thereon, as she would not ask Mr. Hieatzman, her husband, to join in the execution of a mortgage, he not having any mortgage on his own property. She could not say that she did or did not understand the transaction at the time, but she would have been satisfied whether she did or not.

George L. Mahler, a witness produced by the appellee, testified that he was employed at the Fidelity and Trust Company and had charge of all the loans, collaterals, etc., securities, and when informed that Mr. Horner had testified that he had borrowed from his company, upon the hypothecation of the bonds of the Condon-Lane-Boon Lumber Company, the money with which the farm was purchased, stated that the company had no transaction with Mr. Horner in the matter of loans or securities and that the company had never made such loan to him.

Charles P. Wahl testified that in 1907 and 1908 he was employed in the office of Peter E. Tome, in which office Mr. Gunther was also located, and that he saw the deed referred to by Mr. Gunther, executed by Mr. and Mrs. Hieatzman

of the same date as the deed from Sauter to Mrs. Hieatzman, in which deed the name of the grantee was left blank; it was brought to the office by Mr. Evans. He likewise recalled the mortgage bearing date sometime in the spring of 1908, executed by Fox, the existence of which was denied by Horner; this mortgage was prepared by him at the request of Mr. Evans, and was thereafter executed by Fox. The amount of the consideration of the mortgage he did not remember.

After the introduction of the testimony of Mr. Wahl and before signing his deposition, Horner asked to correct his testimony in relation to the second mortgage, by saying that it now occurred to him that in 1908 there was an effort made to borrow some money on the farm and a mortgage was at the time executed by Mr. Fox, but failing to get the money thereon it was destroyed and never used.

The defendants concluded their testimony by offering two exhibits, known as Examiners' Exhibits X and Y, both of which were letters from R. T. Barton to A. N. Horner, one dated December 31st, 1909, but evidently December 31st, 1908, and the other January 13th, 1909. Each of these letters contained a remittance to A. N. Horner for money collected from Sollenberger; the first containing check for $919.67 ("net amount of Waite farm transaction"), while the latter contained draft for $3,621.42 ("In full of the net amount of award in your favor as executor of A. H. Horner, deceased, against Barbara A. Sollenberger and N. W. Sollenberger, trustee", and which had been assigned to H. D. Fuller).

Upon this evidence we have no difficulty in reaching the conclusion that the land described in the deed from Mrs. Hieatzman and husband to Fox is the property of Horner and not the property of either Fox or Mrs. Hieatzman.

Fox, to whom the land was conveyed by Mrs. Hieatzman and husband, concedes that he had no interest in the land other than to oblige Horner and that this transaction was one of many like transactions where he had acted in the same

capacity for Horner, getting nothing therefor except his expenses and what Horner chose to give him.

Mrs. Hieatzman, to whom the land was first conveyed, although at the time living in the City of Baltimore, knew nothing of its purchase until several days thereafter when told by Horner, her brother, that it had been bought for her and with her money. She stated that she had given him no money, and did not know with what money it had been bought, but understood that it was from the undivided estate of her father who had died in 1883.

It will be recalled that Gunther testified that Evans, the party who had been dealing for the property and through whom the purchase of the land was finally consummated, called upon him in relation to the loan that was afterwards made thereon and stated that he was making the application for Horner, and in explanation of the fact that the record title was in Mrs. Hieatzman, said that she was a sister of Mr. Horner and was holding the title as a matter of convenience for him, Horner.

Horner in his answer alleged that he had no knowledge of the interest of Fox in the land and was absolutely silent as to the interest of his sister therein (which he afterwards attempted to establish by his testimony), and this, too, with the full knowledge of the fact, as testified by him, that the money with which the property was bought was her money and with the deed from Fox to her in his possession, which he produced while upon the stand.

The purchase money was paid with Horner's check, but, as he testified, was the money of Mrs. Hieatzman, stating that it was borrowed upon the collateral belonging to her, hypothecated with the Fidelity and Trust Company. In this statement he was positively contradicted by an employee of the company having charge of all of its "loans, collaterals, etc., securities." Nowhere in the record or in the testimony of Horner is it satisfactorily shown upon what bank this check was drawn, a fact which certainly ought to have been within his knowledge and easily recalled by him. He

refers to an account as executor with the Drovers and Mechanics Bank. His account with that bank for the year 1907 was produced and is in the record. It discloses a loan by that bank to him for five thousand dollars upon the Condon-Lane Boon Lumber Company's stock as collateral on February 1st, 1907, which was renewed May 1st, of the same year and finally paid off in partial payments in January, 1908. It is evident that this money was not used in the purchase of the farm, as the sale of the farm was not consummated until July, 1907, when this money was borrowed so early as February 1st of that year, and was finally paid in January, 1908.

By an examination of the will of A. H. Horner, father of Mrs. Hieatzman, it will be seen that the property left to his daughters was for life only and upon the death of each of them it went to their respective children. Therefor, Mrs. Hieatzman had only a life interest in what came to her from her father's estate, and thus it can hardly be thought that a man even as reckless as Horner would not know that she— much less he—could not invest her share in such property as this with such an agreement as was said to exist between Evans and himself, and especially when the title of record was in Fox until after this suit was brought. Both Horner and his sister must have known that neither he nor she had the right to use the money in such way, even had the bonds been set apart to her, which is not satisfactorily proven. If they had been so set apart, what possible reason would there have been for Horner still keeping them so much under his control that he could borrow money on them without even asking his sister's consent? She said it was money of an undivided estate, "I understood it was no money that I had given to Mr. Horner."

The reason assigned by Horner and his sister, Mrs. Hieatzman, for conveying the property to Fox, to avoid asking the husband to execute a mortgage, is not to be believed when considered in connection with the testimony of Fox, who

testified that this was one of many transactions of a similar character wherein he had acted in the same capacity.

Horner at first refuses to tell from what source he obtained the money that was paid to Gunther for the mortgage held by him and of which an assignment was taken by Horner's counsel, Timanus, as attorney. After being hard pressed, he said it was the money of his sister, Mrs. Hieatzman. If this and the fact of her ownership of the land, as claimed by him, be true, we then find him in the position of attempting to sell the property of his sister under a mortgage held by her. Later, in his cross-examination, he testified that it was the money belonging to his father's estate held by him as executor, the proof of which, however, is wanting.

There are many, very many, circumstances and facts which show it to have been a deliberate scheme on Horner's part to keep this and other property beyond the reach of his creditors, but as we have stated the evidence very fully, we do not think it necessary to further discuss them in order to sustain the conclusion we have reached.

1. The answer denies the allegation in the bill that the claim upon which the judgment in this case was recovered against Horner, and which forms the basis of this proceeding, long antedated the conveyance of the property by Mrs. Hieatzman and husband to Fox, and the record discloses that neither the plaintiff nor the defendant in this proceeding took any testimony upon this issue, nor was any reference in the testimony made thereto. The deed was executed on the 29th day of November, 1907, and recorded on the 5th of December following. The suit was brought on December 4th on sixteen notes, the suit being instituted six days after the execution of the deed and one day before it was recorded. We are not, therefore, inclined to think that it would be a violent presumption should we presume that Abramson was a subsisting creditor when the deed to Fox was made November 29th, 1907, and it is shown conclusively that he was a subsisting creditor at the date of the recording of the deed, which was necessary in order to give full legal effect thereto.

But in this case we do not regard it material even though he was not a subsisting creditor at the time, for, as we have held, the purchase was in reality made by Horner or for his benefit, and that it was his property, and it was still his property when the suit at law was brought and when the bill in equity was filed. But if there be a doubt that Abramson was a subsisting creditor at the time the property was purchased, if taken in the name of another to avoid subsequent creditors, it could be set aside. *Matthai, Ingram Co. v. Heather,* 57 Md. 483; *High Grade Brick Co. v. Amos,* 95 Md. 592; *Spuck v. Logan,* 97 Md. 152.

2. In answer to the second objection urged against this proceeding by the appellee, that Mrs. Hieatzman was not made a party to the suit, we will state that as the title of record was in Fox it was not necessary to make Mrs. Hieatzman a party, and indeed it was not proper to make her a party in the absence of some definite knowledge, when the bill was filed, that she claimed it. Had she wished she could have been made a party to the proceeding. She had full knowledge of the pendency of the proceeding—was a witness in the case—and was therefore bound by the decree as effectually as if made a party. *Williams v. Snebly,* 92 Md. 9. The principle laid down in the last named case should apply with great force in this case, in as much as Mrs. Hieatzman deliberately kept the deed from Fox to her off the record until after the proceedings were instituted.

3. The defendant contends that Horner not being a resident of Baltimore county, the Circuit Court for that county was without jurisdiction. The prayer of the bill asks for the annulment and the setting aside of the deed from Mrs. Hieatzman and husband to Fox and the sale of the lands situated in Baltimore county and that the proceeds thereof be appiled to the payment of the plaintiff's claim.

Section 83 of Article 16 of the Code (1904) provides that "All proceedings to enforce any charge or lien on lands shall be instituted in the county where such land lies." "Charge" is defined in *Bouvier's Law Dictionary* as "A lien,

encumbrance or *claim* which is to be satisfied out of the specific thing or proceeds thereof to which it applies." There is no evidence that this judgment which was recovered in Baltimore City has been filed in the county, but even before judgment is obtained such a bill can be filed, and this was at least a *claim* to be satisfied out of these lands or the proceeds thereof.

The same section further provides that "When the defendants or any of them reside in different counties from that in which the land lies which is to be affected by a suit, * * * process may be sent to the county or counties wherein the defendants respectively reside." Pursuant to this provision the defendant was summoned and on the 6th day of July, 1908, entered his appearance to this proceeding, and on the 27th day of the same month filed his answer in which he makes no objection to the jurisdiction of the Court, in fact, no allusion is made thereto. Much evidence was offered both by the plaintiff and the defendant, and so late as September 22nd, 1909, upon a petition filed by him, he obtained from the Court an order extending the time in which he should conclude the taking of testimony, and not until October 2nd, 1909, after all the testimony had been taken, did he file his supplemental answer in which, for the first time, he raises the question of want of jurisdiction in the Court in which the proceeding had been instituted.

This proceeding is based on the claim that Fox had no interest in the land and that it belonged to Horner. If, in point of fact, Fox had interest in the land, Horner would not be the one who would suffer by applying that interest to the payment of his debt, but Fox would be the one. Therefore it would seem to afford Fox more protection by having the order of publication in the county where the land lies. Horner might have lived in a county remote from the county in which the land lies, and Fox would have had little or no opportunity to hear of the proceeding instituted in such county, while if in the county where the land lies, if he was a *bona fide* owner, his tenant or such person as might be in

possession thereof for and on his behalf might see the order of publication and thus notify him. Horner might have said, if this land belonged to Fox, I will not bother about it, and Fox might never have heard of it. So it is more reasonable to require in *such case* the proceeding in the county where the land lies.

Numerous exceptions to the admissibility of evidence were reserved by the defendants. Joseph R. Gunther, a witness produced on the part of the plaintiff, was recalled at the conclusion of the defendant's testimony and later he was again recalled. The recall of the witness on both of these occasions was objected to by defendant's counsel and exceptions taken, defendant's counsel contending that he should not have been recalled as a witness and permitted to testify without an order of the Court. When first recalled it was in rebuttal and no order of the Court was necessary for that purpose. He was examined in relation to matters about which Horner had testified and it is clear that some of his testimony is properly in rebuttal and as the exception goes to the whole of his testimony it can not be considered. *Smith* v. *Humphreys,* 104 Md. 289; *Worthington* v. *Worthington,* 112 Md. 135.

When next recalled, he testified that Timanus had told him that he got the money·from Horner with which he paid to witness the mortgage debt owing to him. In as much as it was admitted by Horner that Timanus did get the money from him and as it is not denied, it is immaterial whether this testimony be admitted or not, and it would not in anywise affect our conclusion.

The defendant also excepted to the admissibility of the deposition of Fox for the following reasons: 1st. That the notice given was that the deposition of Henry C. Fox would be taken, when the name of the party whose deposition was actually taken was Harry C. Fox. 2nd. That it does not appear that the formal question was propounded to this witness and an answer elicited thereupon. 3rd. Irrelevent and immaterial.

The defendant himself was present and participated in the taking of the deposition, and it is clearly shown that Harry C. Fox was the Henry C. Fox named in the notice. We think the deposition admissible.

There were many other exceptions (about one hundred and fifty) taken to the admissibility of certain designated questions and answers extending through the entire record, chiefly upon the ground of irrelevancy and immateriality. Some of the questions and answers are immaterial or irrelevant, but in transactions involving fraud much latitude is allowed in the admission of evidence. We have carefully gone over the exceptions and without referring to and specially discussing and passing upon each of them, we are of the opinion that although some of them are not, strictly speaking, admissible, yet with the elimination of all such testimony the conclusion that we have reached would not be changed thereby.

From what we have said the order or decree of the Court below, dismissing the bill, will be reversed.

> *Decree reversed and cause remanded in order that a decree may be passed in conformity with this opinion, the appellees to pay the costs.*