## CLARENCE W. PERKINS, RECEIVER,

### *vs.*

## CHARLES T. LeVINESS, ET AL.

*Subscriptions to. stock: conditional; return, on failure to per-*
*·form—. Res adjudicata: parties not bound.*

Where subscriptions to stock were made conditionally and for a specific purpose (erecting a building), they can not be enforced if the purpose was never carried out.     · p. 255

A judgment to operate as an estoppel must be upon the same subject-matter and between the same parties; but the term "parties" in this sense is not restricted to those who appear as such upon the record; it includes those who are directly interested in the subject-matter of the suit, who knew of its pendency and had the right to make defense or to control the proceedings and appeal from the judgment.     p. 262

Persons should not be bound by decisions to which they were not parties, either actually or constructively.     p. 262

' *Decided April 8th, 1919.*

Appeal from the Circuit Court of Baltimore City (STUMP, J.)

The facts are stated in the opinion of the Court.

The cause was argued before BOYD, C. J., BURKE, BRISCOE, THOMAS, PATTISON, URNER and CONSTABLE, JJ.

*George A. Finch* and *Clarence W. Perkins* (with whom were *Herbert Levy* and *Forrest Bramble* on the brief), for the appellant.

*Albert S. Brown* and *George M. Brady* (with whom was *William Milnes Maloy* on the brief), for the appellee.

BOYD, C. J., delivered the opinion of the Court.

This is an appeal from a decree dismissing a bill of complaint of the receiver of the Maryland Insurance Agency Company against the appellees to recover what the bill alleges to be unpaid subscriptions to the capital stock of the company. The printed record contains 440 pages and is very confusing, owing to a great extent to the fact that much of it is taken up with objections and arguments of solicitors and the rulings of the Court during the taking of the testimony. As the case is presented by the record, it is difficult to understand what some of the rulings were, but the important questions are few and comparatively free from difficulty. One peculiarity about the case is that Mr. LeViness, named as a defendant, seems to be more or less affiliated with the plaintiff, and the other five appellees are the real defendants. He filed a separate answer and had no solicitor representing him. So when we speak of the defendants, we will generally mean the five. The defendants and several others gave their notes to the company in March or April, 1910, for $3,000 each, and the plaintiff claims that they were given for stock subscribed by them, and that inasmuch as the company was insolvent the directors had no power to cancel those notes and release them from the subscription. The five defendants contend that they gave the notes as loans to the company for the purpose of securing a building in Baltimore City and

further developing the business of the company, and while
they admit that they were to have the option of taking stock,
they claim that they did not subscribe to it.

The minutes of a meeting of the directors held January
25, 1911, contain, among other things, the following: "Upon
motion duly seconded and carried it was resolved that the
president be authorized and directed to take up and return
the notes held by the company issued for stock, and cancel
the stock if issued therefor, as soon as practicable, according
to the proper legal methods." W. Harry Haller is the only
one of the defendants, excluding Mr. LeViness, who was
present at that meeting. LeViness testified in answer to the
question by the plaintiff, "What did you do, if anything, to
carry out the minute of that meeting?" "We entered into
this agreement which was finally signed by all of the defend-
ants in this case." The agreement referred to was executed
on the ———day of March, 1911, between various parties,
including all of the defendants, by which the parties to it
entered into various covenants and agreements, amongst them
that the parties of the first part, who were Thomas H. Haller,
Emory L. Coblentz, W. Harry Haller, William A. Hahn,
John O. Hendricks, William T. Griffith and Motter Brothers
& Co., should sell their stock to Mr. LeViness, and he agreed
to pay the notes of the other defendants in this case, which
had been given to the company. There is nothing in that
agreement to suggest that those notes were given as sub-
scriptions to the capital stock of the company, but on the con-
trary a recital in it is, "And whereas the parties of the second
and sixth parts have loaned to the said Maryland Insurance
Agency Company promissory notes for sundry sums of
money," and that it was understood and agreed that the notes
were to be discounted by the company and that the company
would pay on account of each of them, semi-annually, the
sum of $250 and interest until they were paid. "The parties
of the second part" were those who are now defendants in this
case, excepting Mr. LeViness, and he was the party of the

sixth part. The stock of the parties of the first part which was to be sold and transferred is specifically set out—showing that each of five of them had five shares and each of the other two had three shares of the stock of the Agency Company, for which they had paid.

Without deeming it necessary to refer to all of it, we are convinced by the evidence in this record that neither of these five defendants made subscriptions for thirty shares of stock. The understanding was that the proceeds of the notes given by them to the company were to be used in erecting a building in Baltimore for the company, and for some other purposes, and that the parties who gave the notes were to *have the option* of taking thirty shares of the stock of the company *after the building was erected,* but it never was erected. W. H. Haller testified, "When the building was completed and the other agreements were carried out I was to have the option of taking thirty shares of the capital stock of the Agency Company for that note. It was said and understood by everybody in the concern that there was no obligation on my part to take the capital stock if the buildings were put up or the obligations carried out." Dr. Fahrney said, "I was to have an option on the stock in case the building was put up." After the agreement of March, 1911, a certificate for thirty shares of stock was presented to him by Mr. LeViness and someone else and he told them that he did not subscribe for any stock, that he had an option on the stock if the building went up. They told him they wanted to take up his note, and asked him to endorse the certificate so that they could resell it and he did so. The certificate in his name was No. 45, was cancelled and certificate No. 50 was issued to Joseph L. Stafford for the thirty shares which the stub shows were transferred from Harry P. Fahrney and Stafford paid the company for them. It would, therefore, be impossible to hold Dr. Fahrney for them, and there could be no recovery against him. The evidence of Mr. Newman also shows that he gave his note to help in getting a lot and putting

up a building "and it was optional to me whether I should in
the future take stock or not." The evidence shows that there
was the same understanding with Messrs. Nicodemus and
Hahn, who were sick and unable to testify. The entries in
the books of the company tend to sustain that condition.

The company never erected the building and if there was
no other defense it might well be urged that the company or
its receiver could not recover for the stock by reason of the
fact that the subscriptions, if made at all, were made for the
specific purpose which was never carried out. A good deal
has been said about these defendants being in a pool, so that
they could control the company, and Mr. LeViness, who was
one of the principal witnesses for the plaintiff said, "in view
of the fact that they had subscribed to such large sums of
the capital stock we were to give each member of the pool
an equal voice in the management, but that pool agreement
was never carried out, never entered into." He was then
asked: "The pool agreement was never carried out? A. No,
sir; never entered into." There can be no possible doubt,
therefore, that the record shows beyond all reasonable con-
troversy that the thirty shares of stock alleged to have been
subscribed by each of these defendants was never uncondi-
tionally subscribed. We might refer to other parts of the
record in support of the conclusions we have reached as to the
facts, but deem it unnecessary to do so, and will now consider
the important question remaining, whether in view of the
decisions of this Court in *Peninsula Trust Co.* v. *Johnson,*
128 Md. 535, and *Perkins* v. *Peninsula Trust Company,* 130
Md. 220, the defendants are precluded from taking advant-
age of the defense relied on. It is unfortunate, if they are,
for it would not speak well for the administration of justice
if a Court of Equity is compelled, through its receiver, to
exact money of parties which it is satisfied they do not owe,
merely because of other decisions rendered under a different
state of facts.

In *Peninsula Trust Co.* v. *Johnson,* Dr. Johnson, a stockholder of the Maryland Insurance Agency Company, filed exceptions to an auditor's account distributing the assets of the latter company in the hands of the receivers—Mr. Gill then being a co-receiver of Mr. Perkins, but was afterwards released, as he was in the military service. The contention was made and sustained that the money claimed by the Peninsula Trust Company was due on promissory notes of the Agency Company given to enable it to purchase its own stock. JUDGE BRISCOE, in speaking for the Court, said: "There can be no question, it seems to us, after a careful examination of the record in this case, that the funds and money borrowed from the appellant company were obtained and used for the purpose of retiring certain notes held by the company issued for stock and for the purpose of cancelling the stock obligations of certain stockholders who were not satisfied with the management of the company." After referring to the resolution of January 25, 1911, quoted above, the opinion proceeded, "Subsequently the money was borrowed from the appellant company and applied to the liquidating of certain notes and cancelling the stock subscriptions of some of the stockholders." The question whether the trust company had knowledge of that fact was then discussed and decided.

In *Perkins* v. *Peninsula Trust Company* it was shown that there had been two auditor's accounts stated distributing assets in the hands of the receivers of the Agency Company. After the lower Court had sustained the exceptions of Dr. Johnson to the second auditor's account, which action was affirmed by us in the case above referred to, the receivers filed a petition to have the ratification of the first account, which had not been excepted to, vacated and set aside. The lower Court passed a decree dismissing the petition but on appeal we reversed that decree and remanded the cause for further proceedings. The effect of the decision in the *Johnson case* is, therefore, the important question. Although it

will be seen from what we have quoted above from that opinion that we decided that these notes were given for stock of the company, and that the trust company had furnished the money with which to take up the notes and cancel the stock, having such knowledge of the facts as to prevent its recovery from the Agency Company, our decision was based on the facts then before us, and the conclusions reached by us on those facts are not necessarily binding on these defendants. It was in effect *conceded* in the *Johnson case* that the notes were given for stock subscribed. In the appellee's brief it was said: "There is really but one question involved in this appeal, and that is as follows: Whether or not the trust company had notice that the agency company was borrowing these monies for the purpose of taking up the notes of its stockholders given in payment of stock." The last paragraph was printed in large caps, and in the brief of the appellant it is said: "Notes were given by the subscribers in payment for their stock." That was, therefore, practically a concessum in the case, and the controverted question was whether the Peninsula Company had such knowledge as bound it. LeViness was instrumental in procuring the notes and he testified in that case that they were given for subscriptions, and Dr. Johnson's evidence was to that effect so far as he was concerned, although he did not pretend to know upon what terms these five defendants had given their notes—he did not even know them. The evidence of Mr. Hehl, the expert called by the appellant in this case, shows that on the books the notes were treated as liabilities of the company, which actually made payments on them and reduced the amounts. There was, therefore, nothing on the books to show that these parties had subscribed for stock. Indeed it is difficult to understand the theory of the appellant, for if the appellees each subscribed for $3,000 of stock, why should there be a claim for only $2,750, when the company paid the $250?

Neither of these five defendants testified in the *Johnson case,* nor were they parties to it. There is nothing definite

in the record to show that they even knew of the proceeding, while it was going on, and there is certainly nothing to suggest that they knew that they might be affected by anything that would be done in that case. It is true that Mr. Oscar B. Coblentz, a brother of Mr. Emory L. Coblentz, who is a party to the agreement of March, 1911, was present during part of the trial, taking notes of the evidence of some of the witnesses, and he examined some of the books of the company prior to that time, but it is clearly shown that he was present and examined the books at the instance of his brother, who testified: "At the time he came I represented nobody except myself * * * I happened to find out in some way it was coming up and he had some business in Baltimore. I suggested he come here and hear the testimony. I had not been employed at that time by anybody. My reason for having him there was nothing more than a matter of pride because I had acted as attorney for carrying the transactions through and had been paid a fee for it." He was referring to the matters provided for in the agreement of March, 1911, and testified that he did not think that the defendants even knew that his brother was present. Again he said: "I was a party to the agreement personally and I felt I was justified, and feel so yet, in taking such steps as I could to see that what had been agreed upon there was finally done." Mr. Oscar B. Coblentz testified that during the hearing of the *Johnson case* he talked with Mr. Gill, who was then a co-receiver, and with Mr. Perkins, and suggested that they summon the Frederick people to explain the circumstances under which the notes were given, but they declined and said that those parties could not be affected by the result of that case. The appellees also offered to prove by him that he had made some suggestions to Mr. Miles, the attorney for the Peninsula Company, but on objection of the appellant that was ruled out. Just why it was ruled out we do not understand, although it is stated in the record that the objection was based on the ground that Mr. Miles was dead. That was not a valid reason for excluding the evidence, if it was otherwise

admissible, but it was excluded, and we do not know just what could have been proven. If the evidence would have shown that Mr. Coblentz was suggesting to Mr. Miles to summons the Frederick people, it would have been material and proper, as neither side to the controversy seemed to deem it necessary to summon them, notwithstanding what Mr. Coblentz said to the receivers and possibly to Mr. Miles.

But however that may be, the fact is that they were not summoned, and unless the Peninsula Trust Company had chosen to make them witnesses we do not see how they could have been such, as they could not have aided the exceptant in that case, but on the contrary would have opposed his contention. It would be carrying the doctrine of *res adjudicata* very far to hold that they can not in this proceeding litigate the question whether they did give the notes for subscriptions for stock, because they did not ask to be made parties to the Johnson case. The Peninsula Company, whose claim was excepted to, had the right to conduct the case as its attorney advised, and the appellants could not have controlled it and could not have demanded of that company, or of the Court, that they be made parties. If the receivers were to take part at all in that case, it should have been only to see that the claim of the Peninsula Trust Company was not improperly allowed, and if they had had any voice in the trial of the case it could not properly have been on the side of that company, further than to give it any information necessary to get at the real facts that they had on the subject. They did not except to the audit, and presumably that was either because they did not believe that the company was not entitled to the distributions, or because they did not deem it proper to take sides in the controversy. As Mr. Gill or his partner had drawn the agreement of March, 1911, he must have had all the information that was necessary for him and his co-receiver to have. Mr. Oscar Coblentz said that during one of the recesses of the Court while the Johnson case was pending, he told Mr. Gill that it seemed to him if they wanted

to bring all the facts before the Court, "they ought to summons some of these Frederick people down to find out what the conditions of these alleged notes were and get the fact from that side," but he replied that he did not see why it made any difference to them, as they could not be bound one way or the other. He testified that Mr. Gill also said: "As one of the receivers, I am absolutely opposed to bringing any suit against these Frederick people because they entered into an agreement in good faith to clear the situation, and they have carried out their part of it and as far as I am concerned that settled it."

So if it were true that Mr. Oscar Coblentz was then representing these defendants, which is not the case according to the record, and if ordinarily such part as he took could be held to be so binding on them as to make it questionable whether they could have any further controversy about the notes, it would be most unjust in this case, as according to the uncontradicted evidence Mr. Coblentz suggested to the receivers that these parties be summoned to testify, and both of them said they would not be bound by the proceeding, to permit the remaining receiver to now take a contrary position and claim that they are bound. The conduct of himself and his then co-receiver effectually estops him from taking such a position, to the injury of these parties,—assuming that they were represented by Mr. Coblentz.

But we are satisfied from the evidence that he did not then represent them in such way as to bind them by anything he did—although he afterwards signed the original answer filed by the defendants. His testimony and that of his brother, neither of whom is contradicted, is to the effect that he was there at the instance of Emory L. Coblentz, who has not been sued by the receiver, but was interested because he had represented the defendants when the agreement of March, 1911, was entered into. And beyond all that, we are of the opinion that these defendants could not properly have intervened in the Johnson case. They were not parties to the notes the

Peninsula Company held, on which the distributions were made, and that company had a perfect right to control the conduct of its own case. If its attorney thought that it was safer and better for it to rely on the grounds he took, what right did these defendants have to insist upon coming into the case and claiming that they were not stockholders? Dr. Johnson certainly did not represent them, as he was proceeding directly contrary to their interests.

The general rule on the subject of *res adjudicata* was thus stated in *McKenzie* v. *B. & O. R. R.*, 28 Md. 161, which has frequently been cited, as it is by the appellant. It was there said, "A judgment, to operate as an estoppel, must be upon the same subject-matter and between the same parties. The term 'parties,' however, is not restricted to those who appear as plaintiff and defendant upon the record. It includes those who are directly interested in the subject-matter of the suit, knew of its pendency, and had the right to control, and direct, or defend it." In the earlier case of *Cecil* v. *Cecil,* 19 Md. 72, the Court stated the rule as to the parties to be, "all who are directly interested in the subject-matter, and had a right to make defense, or to control the proceedings and to appeal from the judgment. This right involves also the right to adduce testimony and to cross-examine the witnesses on the other side. Persons not having these rights are regarded as strangers to the cause."

Of course, all parties and their privies are bound, but unless they come within certain well-recognized exceptions none but parties and privies who have had an opportunity to be heard are bound. 15 *R. C. L.* 1005, sec. 481. A number of exceptions to the rule are given in section 482 of the article in that work on judgments. The appellant seeks to have the doctrine announced in such cases as *Parr* v. *State,* 71 Md. 220; *Albert* v. *Hamilton,* 76 Md. 304; *Williams* v. *Snebly,* 92 Md. 9, and *Abramson* v. *Horner,* 115 Md. 232, applied to this one, but while there can be no doubt about the rule being thoroughly established, it is inapplicable here.

In *Parr* v. *State* the action was against sureties of a guardian who had obtained a release from his ward, which was vacated and annulled by a decree of a Court of Equity, and the decree was held to be binding on the sureties for several reasons. The Court said on page 233: "Even as against strangers the record of the equity proceeding and the decree thereon would be admissible to prove *rem ipsam,* and the legal incidents and consequences of the decree, *though not to prove the facts upon which the decree is founded."* (Italics ours.) But the Court went on to say that the sureties were not mere strangers to the operation of the decree, and in relation to the part of the decree which directed the payment of a certain sum by the guardian to the ward, it was held that "such recovery against the principal in the bond, even though the sureties were not parties to the suit, is *prima facie* binding upon the sureties; and they can only relieve themselves of such binding effect of the recovery against the principal, by showing that the amount recovered was in excess of the amount which the plaintiff in the judgment or decree was really entitled to recover, *or that he was not entitled to recover at all."* That principle has since been reannounced by this Court. *Jenkins* v. *State,* 76 Md. 255, 260, 270; *Grafflin* v. *State,* 103 Md. 171, 177. The Court then further held that the sureties had so participated in the defense in the equity suit as to make them parties in legal effect, though not technical parties of record, and as such bound and concluded by the decree.

In passing, it may be well to observe that it could not well be said that those sureties were not conclusively bound by the decree which fixed the amount, and could show that the amount was excessive or that the plaintiff was not entitled to recover at all, but that these defendants were precluded from showing that the plaintiff was not entitled to recover. In *Albert* v. *Hamilton,* 76 Md. 304, a mortgagee sold property under a power of sale, exceptions to the ratification of the sale were filed by the mother, two brothers and a sister

(and her husband) of the complainants, but the sale was ratified. Afterwards those parties filed a bill seeking to have the mortgage set aside and vacated, and that bill was dismissed by the Court. Then the appellants in 76 Md. who were sons of Mrs. Albert and brothers of the other complainants in the former bill (excepting of the husband of the sister) filed another bill seeking to set aside the mortgage on the ground of fraud. Two of the complainants had testified in the former case and all of the parties had united in the mortgage. The Court said that the complainants were proper and necessary parties to the former suit, and if the objection that they were not parties had been brought to the attention of the Court it would have required them to be made so on penalty of dismissal of the bill. The Court said: "These complainants knew of the pendency of the former suit; they ought to have been made parties to it, and they would have been made parties on their own petition. They, by their own neglect or wilful refusal, lost the right to take part in the control of the proceedings, examine and cross-examine witnesses, and appeal from the decree; they, therefore, are embraced within the rule, so frequently declared, that persons who are directly interested in the suit and have knowledge of its pendency, and who refuse or neglect to appear and avail themselves of their rights, are concluded by the proceedings as effectually as if they were parties named on the record."

So in the other cases cited by the appellant, the parties had full knowledge of the proceedings, were witnesses, and they could have been made parties and the circumstances were such as to require them to become parties, if they wanted to protect any interests they had in the subject-matter. Other cases of a similar kind might be cited, and there can be no question about the rule, but it is not at all applicable to this case. No case has been cited, and we have found none, which would deprive these parties of their right to make the defense by reason of the decision in the Johnson case, or the Perkins

case, which is simply a sequence of the Johnson case. If the doctrine contended for by the appellant be carried to its logical conclusion these defendants could not even show that they had paid for the stock prior to the Johnson case, or that it had been transferred at a time when they had the right to transfer it. Indeed as we have seen, the principle contended for is sought to be applied to Dr. Fahrney, although the evidence shows that he transferred the certificate issued in his name to Mr. Stafford who paid the Agency Company for the stock. The rule of *res adjudicata* is a wise and beneficial one when properly applied, but a misapplication of it would result in great injustice in a case like this. It is not necessary to overrule the two cases of the Peninsula Trust Company, or to in any way disturb them, as contended by the appellant, in order to sustain the decree of the lower Court. It sometimes happens that in cases between the same parties, concerning the same subject-matter, different conclusions are reached in two appeals to this Court, by reason of the difference in the evidence in the two records, and it would be unjust, especially under the circumstances we have called attention to, if these defendants were conclusively bound by the decision in the *Johnson case* to which they were not parties, either actually or constructively. Other defenses were presented, but we will not discuss them, although some of them are not without force. Just why it was not shown that there had been a compliance with the statute authorizing the increase of capital stock of the corporation, if there was such compliance we are not informed. The charter of the Agency Company in authorizing an increase beyond that named expressly requires the company to comply with Article 23 of the Code. The statute has been changed several times, but we do not even find in the record when the increase was supposed to have been authorized.

Another defense which we have not thought necessary to pass upon would seem to present a question worthy of some consideration. It has been settled that the Peninsula Com-

pany can not recover from the Agency Company, but as we understand the facts, it did pay the Agency Company for these very notes which the appellant claims were for subscription for stock. Is the Agency Company to collect twice —once for the notes and then for the stock—or to be more accurate, could the Agency Company be paid the notes and its reciver recover for the stock for which the notes were given, according to this contention? But the length of this opinion already reached prevents any discussion of those and other questions.

There was a motion to dismiss the appeal, but we think the receivers were sufficiently authorized to take the appeal, and the motion will be overruled.

*Motion to dismiss appeal overruled, and decree affirmed, the appellant to pay the costs out of the funds in his hands.*