## CHRISTIAN SPUCK ET AL. *vs.* LOGAN & UHL.

*Fraudulent Conveyances—Who Are Subsisting Creditors—Conveyance Upon Secret Trust For Benefit of Grantor—Rights of Subsequent Creditors—Payment of Price After Execution of Voluntary Conveyance Designed to Defraud Creditors.*

When there is a running account between buyer and seller, payments being made thereon from time to time, but there being continuously a debit balance against the buyer, then the seller is to be considered as a subsisting creditor of the buyer throughout the transactions, and entitled to the remedies of a subsisting creditor as against conveyances made by the buyer with intent to hinder or delay his creditors.

A conveyance of property, in form absolute, but in reality upon a secret trust for the benefit of the grantor, no consideration having been paid by the grantee and the purpose of the parties being to hinder and delay a creditor of the grantor, is a continuing fraud voidable by subsequen as well as subsisting creditors of the grantor.

When a voluntary conveyance of prop erty has been made with the pur⁻

pose on the part of both grantor and grantee to defraud the creditors of the former, the fact that afterwards the grantee pays to the grantor the full value of the property does not operate to give validity to the transfer as against creditors.

The owner of certain ground rents conveyed the same in January, 1898, to his son-in-law by a deed professing to be made upon a money consideration, but nothing was in fact paid, and the purpose of the parties was to put the property beyond the reach of a person who was about to institute an action of tort against the grantor. This action was afterwards instituted, but was not tried. The grantor continued to collect the ground rents until December, 1900, when the grantee, who was the owner of the leasehold interest in one of the lots in question, agreed to purchase the rents and did so by paying to the grantor a certain sum in money and surrendering the grantor's promissory note held by him. A new conveyance of the rents was then made to correct a supposed defect. Plaintiffs were creditors of the grantor before the first conveyance was executed on a running account for goods sold upon which payments were afterwards made, but the indebtedness was never at any time wholly liquidated, but constantly increased. Upon a bill to vacate the deeds because fraudulent as against creditors, *held,*

1st. That the plaintiffs were subsisting creditors of the grantor at the time the first deed was made and that conveyance was fraudulent as to them and as to those who became creditors of the grantor while the property was held by the grantee upon the secret trust

2nd. That although the particular purpose of the deed was to defraud a certain creditor holding an unliquidated claim, yet it may be avoided by the plaintiffs and other like creditors.

3rd. That since the deed of 1898 was fraudulent in fact, it was not validated by the payment of a consideration in 1900 and the execution of another deed then, and that consequently all of the deeds are fraudulent and void as against the plaintiffs.

Appeal from a decree of Circuit Court No. 2, of Baltimore City (WICKES, J.)

The cause was argued before BRISCOE, BOYD, PEARCE, SCHMUCKER and JONES, JJ.

*Robert H. Smith,* for the appellants.

*S. S. Field,* for the appellees.

BOYD, J., delivered the opinion of the Court.
This is an appeal from a decree declaring certain deeds

fraudulent and void as against the appellees, who are creditors
of Christian Spuck, and directing a sale of the property men-
tioned therein.   On the 11th day of January, 1898, Spuck
and wife conveyed two ground rents in the city of Baltimore
to Solomon Haas, and on April 30th of that year Haas and
wife conveyed them to William Deehring, one of the appellants,
in pursuance of the original arrangement made between them
when deed of January 11th was made.   Each of those deeds
recites a consideration of eight hundred and fifty dollars, but it
was admitted that no consideration was in fact paid at the time
of the execution or delivery of either of them, and it is con-
clusively shown by the testimony that the transfers were made
to prevent one Charles H. Snack from recovering against
Spuck on any judgment he might obtain in a suit for damages,
instituted on March 1st, 1898.   Deehring, Haas and Spuck
admit that such was the object of the deeds and that no con-
sidration was in fact paid.   Snack, who had been in the em-
ploy of Spuck, claimed he was injured by reason of the latter
negligently allowing the machine which Smack was operating
to become in an unsafe, dangerous and unsuitable condition,
which he claims resulted in the loss of his arm, and he claimed
ten thousand dollars damages in the declaration filed by him.
That suit was never tried and is still pending in one of the Courts
of Baltimore City.   On October 3rd, 1899, Deehring loaned
Spuck four hundred dollars, for which he took his note, pay-
able one year after date, and on October 3rd, 1900, a new
note was given payable twelve months after date.   Deehring
owned a leasehold interest in one of the lots and he agreed
with Spuck in December, 1900, to purchase the two ground
rents for eight hundred and fifty dollars—$450.00 in cash and
the cancellation of the $400 note.   The cash was paid and
the note surrendered, and there seems to be no doubt about
the price named being a fair estimate of the value of the prop-
erty.   Deerhring and wife, and Spuck and wife then conveyed
the two lots to J. W. Oast, by deed dated December 19th,
1900, in which the consideration recited was five dollars and
the same day Oast conveyed them to Deehring and his wife—

the same consideration being mentioned in that deed.  Mr. Strohmeyer, who drew these deeds, testified that "While examining the title, I discovered that there had never been a lease executed for the ground rent which was intended to be conveyed to Mr. Deehring, and for the purpose of wiping out any flaw by putting the property in fee in Mr. Deehring I suggesten that Mr. and Mrs. Spuck and Mr. and Mrs. Deehring convey to Mr. Oast, by which deed all the interest of all the parties was conveyed to Mr. Oast and then a deed by Mr. Oast to Mr. and Mrs. Deehring."  He also said that the original conveyance by Spuck and wife to Deehring "was an assignment of a leasehold interest in one of these lots, subject to a ground rent of $26.26," and in reply to the interrogatory "Had any leasehold interest been previously created?" replied, "No, sir, there had not."

The principal question presented by the record may be thus stated : As the deeds executed in 1898 were confessedly made by or at the instance of Spuck and accepted by Deehring for the express purpose of preventing any recovery by Snack, for damages alleged to have been sustained by him for the injury he held Spuck responsible for, and as the title was thus kept in Deehring until December 19th, 1900 (although Spuck regularly collected the ground rents and acted as owner), are the deeds of the latter date fraudulent, so far as the appellees are concerned, conceding that full consideration was then paid for the lots conveyed ?  A number of questions are involved in this case, but inasmuch as it would not afford the appellees relief to set aside the two deeds of 1898 unless those executed in 1900 can be, the validity of the latter is the important inquiry.  It will be well to first ascertain the relation that existed between Spuck and the appellees.  The latter obtained a judgment against the former before this bill was filed on an account running from January 1st, 1898, to February 5th, 1901.  In the early part of the account the course of dealing seemed to be that for purchases made one month Spuck paid the appellees the next month.  That was apparently continued for sometime, although the indebtedness was growing.  On

January 1st, 1898, there was a balance from the previous year of $305.84, which was paid that month, but an indebtedness of $383.43 was incurred that day which was paid in February, and the balances struck in the account filed were as follows : December 31st, 1898, $574.61, which was the amount of purchases in that month ; June 30th, 1899, $741.60, the amount purchased in June ; January 1st, 1900, $785.07, which is $135.51 more than the purchases during the previous December, and finally on February 5th, 1901, there was a balance of $1,031.32 on which $6.95 was paid in October. There never was a time from January 1st, 1898, to the filing of this bill when the appellees were not creditors of Spuck, and on December 19th, 1900 (the date of the last deed), he owed them $923.85. It cannot be said, therefore, that the appellees were not subsisting creditors of Spuck when he made the deed of January 11th, 1898, although the amount owing to them at that time was subsequently paid. But before it was paid Spuck had in the meantime incurred other indebtedness to them for a larger amount, and that course of dealing continued between them until finally Spuck was indebted to the appellees in the sum stated. If that was all, we would find diffiulty in reaching the conclusion contended for by the appellants, that the appellees were merely subsequent creditors. In *Paulk* v. *Cook*, 39 Conn. 572, it was contended that the debts which existed at the time of the conveyance attacked was made had been paid with one exception, and that a voluntary conveyance could only be impeached by existing, and not by subsequent, creditors, but that Court thus replied : "This principle clearly has no application where there has been a continued, unbroken indebtedness. The debts are owed, though they may be due to new creditors. It is a most unsubstantial mode of paying a debt, to contract another of equal amount. It is the merest fallacy to call such an act getting out of debt." In *Wait on Fraud Con.*, section 103, that author in speaking of the subject says "the case should be treated as if the prior indebtedness had continued throughout, or as a case of a continued or unbroken indebtedness." In this case there is all the more reason to

adopt that rule, as Spuck was indebted to *the appellees* (not merely to new parties) constantly and without interruption from January 1st, 1898, and to say that under those circumstances they must be denied any rights that subsisting creditors have against a fraudulent conveyance would be protecting fraud by a distinction that should not be made in favor of the guilty against the defrauded.

But if such distinction could be made, it would not avail the appellants.   There can be no doubt that whatever fraud was committed on January 11th, 1898, when the first deed was made, continued up to the execution of the deeds of December 19th, 1900.   The real ownership of those lots was in Spuck during all that time.   He collected the rents and did everything an owner of ground rents could do.   Deehring does not pretend to have had any interest in them, and he held them to protect Spuck from Snack and professed to the world to have paid their value for them when he had not paid a dollar.   He does not claim that the $400 represented by the note was intended to be applied to the purchase of them, but on the contrary he swore that was a loan.   He was during all that time concealing the true ownership of the property with the confessed intention of hindering one asserting a claim against Spuck.   In effect he, by the deed to him said, "This is my property, and I have paid $850.00 for it," when in fact it was Spuck's property, and he had paid nothing for it.   During the whole time he thus held the property the fraud was as great as it was the day it was begun, by the transfer of the property—in fact it was probably more injurious, as other people were likely to be affected by it.   During the latter part of 1899 and in 1900, Spuck was getting more in debt to the appellees, and, as we have seen, he owed them on December 19th, 1900, $923.85.   In *Jones* v. *King*, 86 Ill. 229, it is said the rule is settled that where the conveyance is merely colorable and a secret trust and confidence exists for the benefit of the grantor, it is void not only against prior but subsequent creditors, and the reason of the rule is given in a quotation from *Bump on Fraudulent Conveyances*, that, "it is in

such case a continuing fraud, and may actually operate as
such, as well in reference to debts contracted after as before
the conveyance." See also, 14 *Am. & Eng. Ency. of Law*,
268. There would seem therefore to be no room to doubt
that the deeds of 1898 were not only liable to be successfully
attacked by creditors of Spuck in existence when they were
made, but could be by any persons who became such credi-
tors while the title to the lots were held under those deeds,
or either of them.                          •

In 14 *Ency. of Law*, 266, it is said: "It is not necessary,
however, that the fraud should have been directed particularly
against the complainant. A conveyance executed to defraud
one creditor may be avoided by any other occupying a similar
position; that is a fraudulent intent against an existing credi-
tor will avoid the conveyance as to all existing creditors, and
a conveyance made with like intent against a subsequent cred-
itor may be avoided by any standing in that relation." It
was said in *Cooke* v. *Cooke*, 43 Md. 522, that the object of the
Statute of Elizabeth, ch. 5, "was the suppression of frauds, and
ought to receive a liberal construction." We there quoted
from *Twyne's case*, 3 Coke Reports, 83, "That the Statute of
13 Elizabeth, ch. 5, extends not only to creditors, but to all
*others* who had cause of action or suit, or any penalty or for-
feiture," and we added, that "since then it has been repeatedly
held to embrace actions of slander, trespass and other torts."
In *Welde and Logan* v. *Scotten*, 59 Md. 72, we repeated in
substance that language and it was there said that a creditor
who had obtained judgment for personal injuries had such a
cause of action as justified him in attacking any conveyance
made pending the suit, as fraudulently made and executed
against him, if he had cause to so suppose, and that he could
either go into equity to set aside the conveyance or purchase
the property at a sale under a *fieri facias* and institute an ac-
tion of ejectment. It is said, however, on behalf of the ap-
pellants that in those cases judgments had been obtained and
until a judgment is obtained a person occupying the position
of Snack cannot have a conveyance set aside on the ground

of fraud. If it be conceded that sec. 46 of Art. 16, is not broad enough to enable Snack to file a bill to set aside the conveyance, until he obtains judgment, does that necessarily preclude the appellees from doing so? We have already said that they could have filed a bill to set aside the deeds of 1898. If they had done so, there would seem to be but little room to doubt that Snack could have sought relief against the proceeds of sale. In *Gebhardt* v. *Merfeld*, 51 Md. 325, a deed was set aside and objection was made to the form of the decree because "all persons having claims against the Engels are notified to file their claims without regard to their nature," and this Court said with reference to that "It is a mistake to suppose that the Statute of Elizabeth only avoids deeds and conveyances coming within its provisions as to creditors. It enacts that every conveyance made to the end, purpose and intent to delay, hinder or defraud creditors and *others* of their just and lawful actions, etc., shall be void" and continues with what we have quoted from *Cooke* v. *Cooke*. The Court there in effect said that such a claim as Snack had might be filed, but, it being unliquidated, we think the correct practice would be to give such plaintiff a reasonable opportunity to have his case determined at law, before distributing the proceeds, although, of course, he should use due diligence in the prosecution of his suit. If that were not so, the plaintiff in such action might be prevented from any recovery, if creditors who were entitled to proceed without judgment had the property sold before he could get his judgment. But this case does not depend upon the question whether Snack could at the time have filed a bill to set aside those deeds. He is undoubtedly included in the terms of the Statute of Elizabeth, if, as is conceded, the transfers were made to delay, hinder or defraud him. The fraud was *in the transfer* of the property, with that intent, and merely because he had not yet obtained a judgment did not make *the intent* to delay, hinder or defraud him less fraudulent. The fact that he had not obtained a judgment only affected his remedy and if he establishes his claim by judgment his right to attack the deeds re-

lates back to the time of the transfers, provided of course no intervening rights of *bona fide* purchasers, etc., stand in the way.   Although not a creditor in the technical sense, until he gets a judgment, he occupies a similar position to that of a technical creditor under the Statute of Elizabeth and an intent to hinder, etc., him affected the validity of the deeds just as if he had been a creditor in the sense that term is ordinarily used.

Under these circumstances, are the deeds of 1900 valid ? Payment of full consideration is not sufficient to protect Deehring, if the conveyance was not *bona fide.*   "If it be established that the deed was made by the grantor and accepted by the grantee with intent to hinder, delay and defraud. the creditors of the former, it matters not that full consideration has been paid."   *Chatterton* v. *Mason,* 86 Md. 236; *Downs* v. *Miller,* 95 Md. 602.   In 14 *Ency. of Law,* 475, it is said that "a fraudulent grantee can by no subsequent matter confirm the deed to him or purge it of its vice, so as to render it effectual as a conveyance to vest a title in himself."   For that statement the author cites *Halcombe* v. *Ray,* 1 Ired. L. (23 N. Car.) 340.   See also *Halbert* v. *Grant,* 4 T. B. Mon. 581; *Bunn* v. *Ahl,* 29 Pa. St. 391; *Head* v. *Harding,* 166 Ill. 353; *Gentry* v. *Field,* 143 Mo. 413; *Martin* v. *Rice,* 24 Mo. 581; *Lynde* v. *McGregor,* 13 Allen, 172; *Bump on Fraud. Con.,* secs. 628-9.   We are aware that there are authorities of high standing apparently in conflict with that statement of the law. In most of them the apparent conflict is not real when the facts are examined.   There have been cases in which it would have been very inequitable to hold the grantee in a deed responsible, or cause him to lose property which he subsequently paid for, or gave the creditors of the grantor the benefit of, merely because he had accepted a voluntary conveyance, although he did so in good faith and without intending to defraud any one.   But when there is *fraud in fact* on the part of both grantor and grantee and there has been no attempt to return the property thus fraudulently acquired to the grantor, there must be some very peculiar facts proven to jus-

Md.]                     Opinion of the Court.

tify a Court in declaring that the fraud is purged by a subse-
quent payment of a consideration.  As was said in *Bunn* v.
*Ahl, supra,* "There is no valid repentance without entire res-
titution, when this is possible ; and a judgment obtained in
order to defraud creditors cannot be purified by merely aban-
doning the fraudulent purpose and using it for an honest one.
All the benefits of the fraudulent arrangement must be fore-
gone."   In Massachusetts the doctrine that a fraudulent con-
veyance may be purged of the fraud by a matter *ex post facto*
has been carried as far as in any Court of such high standing
brought to our notice, but in *Lynde* v. *McGregor, supra,* it was
said : "But no authority has been found, and we cannot be-
lieve that any exists, for the proposition that where a contract
expressly and intentionally fraudulent has been made, it is
possible to give it a partial validity by any subsequent pay-
ment or advance in part, without rescinding the whole. If any
part of the original purpose is fraudulent, the whole may be
avoided, though made upon sufficient consideration.   And in
like manner, *if any part of the fraudulent purpose remain*, it
vitiates the whole."   Without quoting from other cases or at-
tempting further to reconcile them, it seems to us there can
be no question about the invalidity of the deeds of 1900 under
the facts proven, some of which we will recall as reflecting
upon this branch of the case.

   Spuck and Deehring both went on the stand and swore to
circumstances which the law condemns as *fraud in fact.*  The
one conveyed and the other received these lots with the de-
liberate intent to do what the law pronounces fraudulent.
Taking them with that intention Deehring held them over
two years and a half under a deed that professed that full con-
sideration had been paid for them, and that they were his and
not Spuck's.   In the meantime he had become a creditor of
Spuck for nearly half of the value of the property.   He got
that indebtedness paid in full and paid the balance in cash.
Two months afterwards Spuck made an assignment for the
benefit of his creditors and paid less than one per cent to his
other creditors.   If Deehring had paid full value at the time

the property was originally conveyed to him, the fraudulent intent with which the deed was taken would still have made it void, and upon what principle can it be said that although the conveyance was originally executed and accepted in fraud, yet when the grantee paid for it several years afterwards his payment was *bona fide* and therefore gave it new life, freed from the infirmities attaching to a fraudulent instrument? During that time he apparently checked Snack from all efforts to obtain a judgment—at least his suit was not brought to trial, and if the deed to Deehring was *bona fide*, as it purported to be it would perhaps have been useless for Snack to get judg·ment, if he was entitled to it; and, after accomplishing that Deehring now claims the property by paying $450 and surrendering a note which was not at the time worth its face value, if we are to judge from what the other creditors got, under an assignment made two months later. Under those circumstances it is clear that he could not have held these lots under the deed of April, 1898, and can he by this new deed get any better title? We think not. We have already quoted the testimony of the conveyancer as to the reasons for adopting that plan. It was because he thought there was some defect in the deed from Spuck to Deehring. The deeds are not set out in the record, and hence we do not know what the recitals are, beyond what we find in some memoranda of them, which refer to both deeds of 1900 as "conveying the same property for recited consideration of $5.00." They do not state it to be $850.00, as those of 1898 did, which was, we presume, because the conveyancer was simply aiming to correct the defect he had discovered, and for that reason doubtless united Mr. and Mrs. Spuck with Mr. and Mrs. Deehring in the deed to Mr. Oast. But for the supposed defect discovered by the conveyancer, they would probably have relied on the old deeds—certainly as between Spuck and Deehring they would have been sufficient—Spuck could not have recovered the lots from Deehring, by reason of his participation in the fraud, and after the purchase-money was paid him, there could have been no possible ground for him to base any claim for

them.    Therefore Spuck by joining in the new deed to Mr. Oast conveyed nothing, so far as these ground rents are concerned, even if it was necessary to perfect the leasehold title. But beyond all that the suit of Snack was still pending and although Spuck had the additional intention of getting the purchase-money, it is not shown that his intent or that of Deehring to hinder Snack ever lessened one particle from what it was originally was, and the presumption is that it still continued as there was so far as the record discloses as much reason for it then as before.    There might have been some indication of repentance and a desire to restore Snack to the position he occupied before the deeds of 1898 were made, if the property had been reconveyed to Spuck, but that was not done.    The transaction was in effect an attempted payment of the purchase-money named in the fraudulent deeds, which in our opinion could not confirm them or purge them of the fraud, for, as we have said, if that had been paid when the deeds of 1898 were made, they would still have been fraudulent by reason of the intent to hinder Snack.    In the new deeds five dollars was named as the consideration, and the only instruments where the consideration of $850 is mentioned are those of 1898.    Spuck and Deehring thus undertook to convey to a third party a title not only tainted with fraud, but up to that time admitted to be so held as to make it fraudulent, with the understanding that it should immediately be conveyed to Deehring and his wife.    If Deehring had conveyed that title without having Spuck to unite in the deed, with the understanding that it should at once be reconveyed to him and his wife, it certainly could not be pretended that he would thereby have acquired any better title than he had under the deeds of 1898, and how can the fact that Spuck united in it give the transaction any validity?    If Mrs. Deehring had been a *bona fide* purchaser for value, without any knowledge of the prior transaction, there might be some ground for contending that her interest could not be reached, but the proof shows that the cash paid was Deehring's money, which he had deposited in bank in the joint names of himself and wife, and the note used in part payment was his.

We have not thought it necessary to dwell on the fact that Mrs. Deehring was the daughter of Spuck; or to discuss the probabilities of knowledge by her and her husband of Spuck's financial condition, although they are circumstances proper to be considered with the other facts. Nor have we discussed the use of the money paid by Deehring to Spuck. If the appellees actually received $143.00 of the $400 borrowed from Deehring, when the note was given in 1899, as appellants contended, that fact cannot reflect on this question. It is not pretended that the appellees knew how Deehring was holding the property, or that they ever had the slightest reason to suppose that Spuck had borrowed any money from him. They received none of the cash payment of $450.00, although considerably more than half of Spuck's indebtedness was due to them. Nor will we attempt to point out all the different ways by which the appellees and other creditors have probably been injured by the conduct of these parties—one is sufficient. In July, 1900, the appellees employed counsel to examine the records. He reported that Spuck had no real property, so far as he could find—that he had owned two ground rents which he conveyed to Hass on January 11th, 1898. If the deeds of 1898 had not been made and on December 19th, 1900, Spuck had conveyed the lots to his son-in-law, Deehring, is it not probable that when he made the deed of trust, less than two months after that date, the appellees or some of the creditors would have investigated the transaction? If they had done so they might at least have avoided the preference Deehring obtained for the $400 debt Spuck owed him, but when they found the transfers of 1898, which recited a proper consideration, they were easily misled by them; and if the deeds of December, 1900, were apparently made to correct errors they would not suggest any fraud in the original transaction, even if the records had been again examined which would have seemed useless. But this only illustrates how such fraudulent transactions do in fact injure creditors and therefore how proper it is for Courts to strike them down when the circumstances justify it.

We are of opinion that by reason of the facts disclosed in this record the Court below was right in declaring all of the deeds fraudulent and void, as against the appellees. The decree provides for the sale "of the two ground rents," and therefore the leasehold interest of Mr. Deehring was not intended to be affected by it. That interest should not be sold, and understanding that to be the meaning of the decree, we will affirm it.

*Decree affirmed, the appellants to pay*
*the costs.*

(Decided April 2nd, 1903.)