WILLIAM W. CRANE, trustee in bankruptcy,

*v.*

JOSEPH H. T. BREWER et al.

[Submitted October 17th, 1907. Decided October 19th, 1907.]

1. Where the ownership of a bank deposit was in dispute, and defendant, to substantiate her statements, offered a pass-book, all the leaves of which excepting one had been destroyed by her, and her name was written on the front cover and the remaining leaf below her deceased husband's, through which a line was drawn, the evidence was discredited, where the only explanation given was that she destroyed the entries because she thought they would never be of further use to her, and where she made no attempt to examine the bank books and verify her statements.

2. That a husband authorizes his wife to draw upon his bank deposit does not show a gift to her, the act being consistent with his continued ownership of the deposit.

3. Where, when defendant made a voluntary conveyance, he owed a debt, and was thereafter indebted on a running account, it was not necessary, on a bill to set the conveyance aside, to prove actual fraudulent intent merely because after the conveyance he had paid sufficient on the account to pay the amount due when the conveyance was made.

4. Under the express terms of the Bankruptcy act of July 1st, 1898 (*30 Stat. 565 ch. 541 § 70e; U. S. Comp. St. 1901 p. 3451*), a trustee in bankruptcy represents all the creditors of the bankrupt, and takes all his property and rights, and may institute such proceedings to avoid illegal transactions as any of them might.

On final hearing on bill, answer, replication and proofs.

*Mr. Edwin B. Goodell,* for the complainant.

*Mr. John J. Fallon,* for the defendants.

HOWELL, V. C.

The bill in this case is filed to set aside a conveyance of lands upon the ground that it is voluntary and in fraud of creditors. The facts are these: In February, 1902, Gilbert T. Brewer pur-

chased the land in question, paying therefor $12,500 in cash and taking the title thereto in his own name. He died intestate on June 17th, 1902, leaving two sons to whom the title descended, subject to the right of dower of his widow. On July 26th, 1902, his two sons joined in a conveyance of the land to their mother. At the time of this conveyance the defendant Joseph H. T. Brewer was in business in New York City, and was indebted on account thereof, among others, to Rubenstein Brothers, to whom he owed $888. He continued to trade with Rubenstein Brothers until 1906, and, although subsequently to the conveyance to his mother, he had paid on account from time to time sufficient moneys to liquidate the amount that he owed them at the time of the conveyance, he owed at the time of his bankruptcy a larger sum.

He was adjudicated a bankrupt in November, 1906. The complainant is his trustee and he files his bill in that capacity to set aside the conveyance to the mother.

The first defence insisted on is that the original purchase-money for the property in question was paid from an account in the Morton Trust Company of New York. This account, as is claimed by the defendants, originally stood in the name of G. T. Brewer, the husband, alone; it is asserted that about three years before the husband's death he and his wife went to the banking-house of the Morton Trust Company to insert the wife's name in the account so that either might draw the money, and that the account stood in this position down to and after the death of the husband, at which time there remained on deposit $1,800 which the wife drew on her check after his death. The money that was drawn to pay for the land in question was drawn by a check which the wife did not sign. This is the evidence of the wife, whose title is now attacked, and I shall assume that the check was signed by the husband alone. She produces a pass-book issued by the trust company to substantiate her statements. Instead of aiding her, I think this exhibit casts suspicion on her whole statement. The book is mutilated almost beyond recognition. It consists of a leather cover on the outside of which is some printed matter showing that it was issued by the Morton Trust Company; all the leaves containing entries, excepting one, have been torn out

and destroyed by the defendant who produced the book; the remaining leaf contains, first, the name of G. T. Brewer through which an ink line has been drawn, and the name of the wife; the same names and erasure appear on the front cover of the book. A book mutilated by the person who produces it in court as the foundation of his rights always excites suspicion, unless satisfactorily explained. Here the only explanation is that she destroyed the entries because she thought they would never be of further use to her. This, in my opinion, does not explain the matter at all. It would have been very easy to examine the books of the Morton Trust Company and have verified the statement. The fact that this was not done converts the suspicion into an almost established fact.

But suppose that the entry in the books of the Morton Trust Company had been proved as alleged, then the result would have been that there was on deposit with the trust company a sum of money which originally belonged to the husband, but which could be drawn by either party. This alone would not be evidence of a gift to the wife. *Skillman* v. *Wiegand, 54 N. J. Eq. (9 Dick.) 198;* *Taylor* v. *Coriell, 66 N. J. Eq. (21 Dick.) 262.* The act of authorizing the wife to draw upon the fund is entirely consistent with the husband's continued ownership of it.

I therefore conclude that the real estate in question was purchased by the husband with his own money; that it belonged to him, and upon his death his wife had no equity to claim title to it, and hence that she has failed to show a resulting or other trust.

The second defence is that, although the bankrupt owed Rubenstein $888 at the time of the conveyance, yet that this had been fully paid, and hence it was necessary to prove actual fraudulent intent in order to set aside the transaction. This view is, in my opinion, erroneous.

The point arose in 1834 before Vice-Chancellor Shadwell in *Whittington* v. *Jennings, 6 Sim. 493.* In that case there was a voluntary transfer of a sum of money at a time when the donor was indebted on a running account. The donor afterwards made payment on this account exceeding in amount the balance due at the time of the voluntary conveyance. The balance, however,

continually increased. The creditor took proceedings to set aside the voluntary conveyance, and the same defence was set up there as is now relied upon here. The defence was overruled and the conveyance set aside.

In *Spuck* v. *Logan, 97 Md. 152; 54 Atl. Rep. 989,* it was held that where there was a running account between buyer and seller, the buyer making payments from time to time but having a debit balance continually against him, the seller is a subsisting creditor in respect to fraudulent conveyances by the buyer. There the facts were these: The voluntary conveyance was made January 11th, 1898. On the 1st day of that month (January 1st, 1898) there was a balance from the previous year of $305 owing to the complainant. This amount was paid during the month of January, but an indebtedness of $383 was incurred, which was paid in February. The balances continued to increase until they amounted to $923. It was held that the complainant was a creditor in 1898 and continued such until the filing of the bill. The court says:

"There can be no doubt that whatever fraud was committed on January 11th, 1898, continued up to the execution of the deeds of December, 1900. The real ownership of these lots was in Spuck during all that time. * * * During the whole time that Deehring thus held Spuck's property the fraud was as great as the day it was begun by the transfer of the property, in fact, it was probably more injurious, as other people were likely to be affected by it."

In *Paulk* v. *Cook, 39 Conn. 572,* it was contended that the debts which existed at the time the conveyance attacked was made had been paid, with one exception, and that a voluntary conveyance could only be impeached by existing and not by subsequent creditors, and the court thus replied:

"This principle clearly has no application when there has been a continued unbroken indebtedness. The debts are owed though they may be due to new creditors. It is a most unsubstantial mode of paying a debt to contract another of equal amount. It is the merest fallacy to call such an act getting out of debt."

That case extended the rule to creditors who had advanced the

money to pay off the old debts, and such was the decision in *Savage* v. *Murphy, 34 N. Y. 508 (1866)*.

In the case at bar the creditor is the same person to whom the money was originally owing, making a much stronger case than the two last cited; the debtor was never out of debt.

To the same effect is *First National Bank of Asbury Park* v. *White, 60 N. J. Eq. (15 Dick.) 487*, but reported at much greater length in *46 Atl. Rep. 1092*. The question there related to an indebtedness by promissory notes at the time of the fraudulent act complained of, and it was insisted that the promissory notes then outstanding were paid by renewals. Vice-Chancellor Reed held, and his decree was sustained on appeal, that the indebtedness was continuously the same.

The trustee in bankruptcy represents all the creditors of the bankrupt and takes all his property and rights, and he may institute such proceedings to avoid illegal transactions as any of them might. *Bankr. L. § 70e (1898)*.

The result is that the complainant will have a decree setting aside the transaction as one violative of the statute of frauds.