E. H. HOYT, Receiver, Appellee, v. N. HAMPE et al., Appellants.

DECEMBER 15, 1925.

Opinion on Rehearing July 1, 1927.

Supplemental Opinion June 26, 1928.

*J. M. Parsons, E. C. Roach, Wagner, Pike & Knoepfler,* and *Warren H. White,* for appellants.

*Parrish, Cohen, Guthrie & Watters* and *Thomas & Myers,* for appellee.

Morling, J.—The defendants were the board of directors of the Interstate Automobile Insurance Company, of Rock Rapids, Iowa, of which the plaintiff was appointed receiver in November, 1921. On February 28, 1921, the defendants agreed to sell to the Gardner Mortgage & Securities Company of Bloomington, Illinois, their 1,325 shares of stock, at $300 per share, totaling $397,500, of which the Gardner Company paid $50,000. This $50,000 payment is not in controversy. The balance, of $347,500, was paid by two checks, drawn on the bank accounts of the Interstate Company,—one for $250,000, on the Iowa Savings Bank of Rock Rapids, and one for $97,500, on the Des Moines National Bank. The present suit is brought to recover the amount of these two checks. The defendants' claim is: First, that they sustained no trust relationship to the creditors of the company, and also that it is not shown that there were such creditors at the time the checks were drawn, or creditors who would have any right to complain. Second, that the deposit of the Interstate Company with the Iowa Savings Bank was uncollectible, and could not be utilized by the company; that the Gardner Company, in connection with the purchase of stock, agreed to contribute $100,000 to the company's surplus, and put in the assets securities which could be utilized; that defendants relied in good faith upon the Gardner Company's agreement, and are not responsible for the failure of the Gardner Company to carry it out.

Two or three principles of law should be borne in mind in the consideration of the facts of the case. The stockholders of a corporation are not entitled to a distribution of the assets among themselves while corporate debts remain unpaid. The creditors must be paid before the stockholders are entitled to corporate property, and the latter are entitled only to what remains after the debts are paid. The creditors have (except as against bonafide purchasers) an equitable right in the assets, in the nature of an equitable lien. *Luedecke v. Des Moines Cabinet Co.*, 140 Iowa 223; *Farnsworth v. Muscatine P. & P. I. Co.*, 177 Iowa 21, 24, *et seq.*; *Northern Pac. R. Co. v. Boyd*, 228 U. S. 482 (57 L. Ed. 931); *Central Imp. Co. v. Cambria Steel Co.*, 127 C. C. A. 184 (210 Fed. 696, 706). A distribution of assets among the stockholders while there are unpaid creditors who would be prejudiced thereby is, in law, as to such creditors, fraudulent. Idem. The directors are primarily trustees for the corporation and its stockholders, and it is their duty to manage the affairs of the corporation and administer its assets in accordance with the law and the legal rights of all persons interested. Manifestly, in such management and administration, the board of directors owe to the creditors the duty of not making a disposition of corporate assets which would, as to the creditors, be fraudulent, or which would naturally result in unlawfully prejudicing their rights. The directors have the custody and control of the assets of the corporation for the benefit of those to whom they belong, and necessarily, in the respects indicated, sustain a trust relationship to the creditors. *Hibernia Bank & Tr. Co. v. Succession of Cancienne*, 140 La. 969 (74 So. 267); *Wilkinson v. Bauerle*, 41 N. J. Eq. 635 (7 Atl. 514). If the corporation is insolvent, the directors are trustees for the creditors, as well as the stockholders. Idem; *Johnson v. United Railways Co.*, 281 Mo. 90 (219 S. W. 38); *Beach v. Williamson*, 78 Fla. 611 (83 So. 860, 9 A. L. R. 1438); 5 Thompson on Corporations (2d Ed.), Sections 6171, 6173, 6175; 1922 Cumulative Supplement, Idem; *Mica Prod. Co. v. Heath*, 81 N. H. 470 (128 Atl. 805); *Pender v. Speight*, 159 N. C. 612 (75 S. E. 851); 14a Corpus Juris 169; *Wabash R. Co. v. Iowa & S. W. R. Co.*, 200 Iowa 384; *First Nat. Bank v. Fireproof Storage Bldg. Co.*, 199 Iowa 1285. A fiduciary may not, directly or indirectly, appropriate the trust fund to himself, without the concurrence of the *cestuis*, with full knowledge of

the facts. Idem; 3 Pomeroy's Equity Jurisprudence, Section 1073. Such an appropriation would be voidable at the option of the *cestuis,* without any showing of fraud, negligence, or prejudice. Idem. Certain classes of contracts made by interested directors have been sustained, on a showing of fairness and good faith (on which the directors have the burden of proof); but those cases are not applicable to the facts of this case. See 2 Thompson on Corporations (2d Ed.), Sections 1225, 1226, 1227, 1232; 14a Corpus Juris 125 *et seq.;* Section 1621, Code of 1897. When a corporation has become insolvent, and a receiver appointed, the receiver represents the creditors, and has the right of disaffirmance. 14a Corpus Juris 1002, 1003.

The insurance company was required not only to pay losses occurring on policies in force, but also, for the purpose of protecting policyholders; to maintain its capital, and to hold a reserve for unearned premiums. Acts of the Thirty-seventh General Assembly, Chapter 429; Acts of the Thirty-ninth General Assembly, Chapter 190; Code of 1897, Section 1731. Policyholders, in paying their premiums and taking out policies, gave credit to the company, and from the dates of their policies had the right to require the fulfillment of these obligations, and were creditors. 2 Words & Phrases 1713 *et seq.* See, also, *Burnham & Van Shaick v. N. W. Ins. Co.,* 36 Iowa 632; *Shloss. v. Metropolitan Sur. Co.,* 149 Iowa 382.

The Interstate Company was organized as a stock company in 1918. Its capital stock, at par value of $100 per share, was $200,000. The record does not show the amount of insurance carried, but the gross premiums, according to the examiner's report, as shown in the ledger assets December 31, 1919 (we assume for the year), were nearly $1,000,000, and gross losses $311,373.05. It is shown that claims made against the company during the first six months of 1920 amounted to $15,000 to $18,000 per month. In November and December of 1920 and the first two months of 1921, they increased to $45,000 or $50,000 per month. During 1920, the defendants contributed to the surplus of the company $135,000. This money was borrowed by defendants, and, as will be noted, the funds realized from the checks in controversy were used, in large part at least, to pay defendants' notes (and those of their wives) therefor. In the

latter part of 1920, the defendants took under consideration the matter of increasing the capital of the company, and later, the question of procuring reinsurance, and also consolidation. In the course of their efforts to procure reinsurance, they met H. P. Gardner, of Bloomington, Illinois, who was extensively engaged in insurance operations, and authorized him to effect reinsurance. The defendants had looked up the financial condition of Gardner and his company. Gardner showed them his residence, worth $30,000 or $40,000, and the residences of his associates, worth more; he showed them his office, in which 30 or 40 people were employed. Defendants were informed that Gardner had an extensive insurance business. On October 30, 1920, a bank at Bloomington wrote defendants that Gardner "recently went in for sale of bonds as side line and now endeavoring to promote Gardner Mortgage & Securities Company (or similar name) with capital as much over million as possible to raise. Promotion slow at present. Object when promoted to make and resell mortgages, loans * * * They deal some in city real estate and buy and sell as well as building on their own capital. Reputation good."

Defendants were informed by another bank that Gardner was considered honorable, upright, prompt in every way.

"We give him quite a good line when in funds, business is very good. Probably does the largest insurance business in the city. Responsibility probably $20,000."

Another bank informed defendants that they considered Gardner very highly, one of the most successful insurance men in that part; that he had made good. Gardner agreed to arrange for reinsurance. He told defendants that he could better arrange for it by having stock. On January 15, 1921, an agreement was made by the defendants with the Gardner Loan & Trust Company, to sell to the Gardner Company 1,000 shares of the insurance company stock at $280 per share, payable $50,000 in cash on or before January 25, 1921, $50,000 on or before February 10th, and $180,000 in approved bonds or securities on or before February 10, 1921. Gardner made none of these payments. Before February 28th, defendants reached the conclusion that further dealings with Gardner were useless. They so

notified Gardner, but agreed to give him a further hearing. Tonne, the secretary of the Interstate Company, testifies:

"The negotiations going on between the board and Mr. Gardner at first were mostly explanations or reasons for the delay in reinsurance. The majority of the board commenced to feel that they should make reinsurance arrangements independent of Mr. Gardner, under the existing conditions. There seemed to be considerable attempt to find ways and means to further the reinsurance contract, and there was some talk about the sale of 1,000 shares of stock, for which he had previously a contract for; and that is when the first suggestion came from him that he was handicapped by not having control of the company; * * * he first broached the subject of buying control of the company himself, a day or two after he arrived. That was talked over with members of the board, and the contract of February 28th resulted from that. He claimed he could more easily carry out the plans of the reinsurance merger; * * * there was conversation between Gardner and members of the board about the ability of Mr. Gardner in carrying out a contract of this character. One was that the Gardner Mortgage & Securities Company had assets of approximately $600,000 that were available and acceptable for reinsurance purposes. He said he controlled them and could use them, I think. He mentioned his connection with the Great American Insurance Company, if [with] the assets of the Gardner Mortgage & Securities Company he could get plenty from the Great American."

On February 28, 1921, a contract was made by which defendants agreed to sell to Gardner Company 1,325 shares, at $300 per share, a total of $397,500 to be paid $50,000 March 8, 1921, in securities acceptable to the insurance department; the balance "in the same class of securities at such time or times as the Iowa Savings Bank of Rock Rapids, Iowa, can liquidate the securities which are to be furnished to the said bank * * * on or before May 1, 1921." By this agreement the defendants Bradley and Maloney were to retire from the directorate immediately on the payment of the $50,000, and thereupon, Gardner was to be elected director and vice president. It was agreed also that the Interstate Company should engage in the general fire insurance business under the management of Gardner, and as he might

determine; but the automobile business was to be managed at Rock Rapids.

Gardner paid the $50,000 in securities. The defendants sold them, and used the proceeds upon their notes previously referred to. No claim is made in this suit for the $50,000. It was understood that Gardner could not utilize and did not want the Iowa Savings Bank deposit, and that the funds on deposit in the banks were to be used in payment of the stock. It was the understanding that Gardner was to substitute in the assets of the company good securities, in the place of the bank deposits. Bradley and Maloney resigned, and Gardner was elected director and vice president March 14, 1921. (The other defendant directors retired during May and June, 1921, after receiving the checks.) On April 8, 1921, no further payment having been made, a so-called "escrow agreement" was made, by which the Gardner Company gave its promissory notes for $347,500, and deposited them with the American Bank at Bloomington, Illinois. The Gardner Company also deposited in the American Bank, as collateral, promissory notes held by the Gardner Company and received by it for its stock in various amounts from $71.80 to $15,000, aggregating $131,071.80. This deposit was made under agreement that, if the Gardner Company's notes of $347,500 were paid by May 18, 1921, the collateral was to be returned to the Gardner Company; otherwise to become the property of Tonne (defendants?).

On May 6, 1921, Gardner by letter requested Tonne to have the American Bank release the securities. The letter stated:

"The $347,500 note signed by the Gardner Mortgage and Securities Company, will be taken up upon this release and we are issuing a new note for $220,378.20. This will make good the amount taken out for payment of the stock and these are all assets readily admitted by the Department. As soon as I get the VanNest stock, will then make the contribution to surplus and in different class of securities."

In the meantime (April 28, 1921), the defendants had contracted with the owners of all of the rest of the stock (except that held by VanNest, 125 shares) to purchase 66 per cent of their holdings at $200 per share, for which defendants, except Bradley, gave their notes, due in two years, payable in certifi-

cates of deposit of the Iowa Savings Bank of Rock Rapids. The sellers agreed to exchange the balance of their stock in the Interstate Company for stock in the Gardner Company. As early as January 31, 1921, Gardner, in one of his telegrams to defendants, expressed as one of the terms of payment for the stock that payment was to be made ''as fast as funds can be released by bank.'' The Interstate Company had on deposit with the Iowa Savings Bank as high as $545,000. Defendants claim that the bank was insolvent. The evidence is that, on December 31, 1920, there was deposited in the Iowa Savings Bank $460,000; but losses and expenses were paid from the account, decreasing it to $300,000 on February 28, 1921. The testimony of the president of the bank, as a witness for defendants, is:

''The insolvency of our bank at that time was not that it did not have plenty of assets to take care of its liabilities. It was impossible to make collections, and the bank suffered losses on many of their bills receivable. Our bank is still doing business, and is solvent. We think it had plenty of assets.''

He says that the bank could not have paid over the deposit then, and could not today.

''Most of this has been paid out, in the way of another deposit, in lesser amounts, so that it has substantially all been paid, from time to time, along in the different ways and at the different times.''

It was arranged between defendants and Gardner that defendants would take over the deposit, and that Gardner would make a contribution to surplus in acceptable securities. The matter had been talked over with the insurance commissioner, Mr. Savage. The defendants claim that the commissioner had agreed that temporarily Gardner might deposit the notes of the Gardner Company and collateral, as such contribution to surplus. The Interstate Company had been examined, and the capital was found to be impaired to the amount of $50,000. Mr. Savage testifies that he talked over ways and means with Tonne and Gardner.

''Gardner said he could make good the impairment, and provide for enough surplus to keep the company working. When I asked him whether or not he would do this in cash,—put up

cash on behalf of the company, or to buy the company,—he said 'no,' he couldn't do it then, but he would put up notes of the Gardner Mortgage & Securities Company for $100,000, to make the impairment good and provide some little surplus. We didn't like the idea very well, but did consent finally to the company, taking the surplus with the idea and the assurance that, in a short time, the Gardner Mortgage & Securities Company would replace the notes with proper security; and we reached the conclusion that the securities were acceptable under the law; but still, in view of that fact, we didn't like the class of paper with the assets of the company, and that was the reason we asked them to replace it as soon as possible with other securities, which they agreed to do.''

On May 7, 1921, Gardner wrote to Tonne:

''We made up a list of securities which the Inter-State is buying from the Gardner Mortgage and Securities Company. These securities may not appeal to you as an investment on the face of it, but they are securities that are acceptable to the Illinois Department and in accordance with my conversation with Mr. Savage of the Iowa Department. This is simply an emergency arrangement and they will be taken down and mortgages, cash or bonds put in their place in the next sixty days, all according to what our future program turns out to be.

''There are a number of fire companies right now which we are trying to bring into the fold. The securities within listed are acceptable as payment of the reinsurance of the liability of the Inter-State in two different companies, so I think they will be satisfactory for the purpose.

''I am meeting parties Monday in Chicago, relative to taking over the liability. The more I think of it, the more unwilling I am to let loose of it, as I am now firmly convinced that there is a very handsome profit in running this business off.''

The list of securities referred to in this letter included promissory notes, of the character of, and to a large extent identical with, the list of $131,071.80 previously referred to. This later list included such notes to the amount of $127,121.80, and Gardner Company notes of $220,378.20, making the total of $347,500, the balance of the contract price for the original 1,325 shares. The defendants, on receiving the checks in question, released the

"escrow agreement," and the 1,325 shares were delivered to Gardner. Tonne testifies that he had notified Gardner that defendants did not care to sign the release until he finished the contract; that the request for a release was a surprise, because Gardner had told him "he would send me a list of securities, so the company's records could be properly supported."

Tonne testifies:

"Q. Now, you say it wasn't your contract, but you were not willing to trust him to do that,—at least you refused to? A. I might have been willing, but there were others interested. Q. Well, when I say you, I mean you people that you represented. A. Yes."

The evidence is that the agency plant of the Interstate Company was worth from $100,000 to $200,000. Gardner was desirous of having this plant, and the sale of the stock gave him the control of it.

Tonne drew the two checks dated May 9, 1921: one for $250,000, on the Iowa Savings Bank, payable to the Gardner Mortgage & Securities Company; one for $97,500, on the Des Moines National, payable to the Iowa Savings Bank. These checks were inclosed in an envelope, taken by Maloney to Chicago, there indorsed by the Gardner Company, through Gardner, in blank, and returned to Tonne. Maloney says he did not know what the checks were, or have any part in the division. Tonne deposited the checks in the Iowa Savings Bank. The proceeds were used in paying the notes of the defendants (and their wives), including notes at the Iowa Savings and $100,000 of notes at the Des Moines National Bank; and the balance of such proceeds was paid by certificates of deposit of the Iowa Savings Bank to the defendants and to the minority stockholders, whose stock defendants had purchased. The evidence is that the majority and minority stockholders ultimately realized about the same amount for their stock,—about $200 per share.

Respecting the financial condition of the Inter-State Company and the interests of creditors, it may be noted that, on April 11, 1921, defendants adopted a resolution reciting that the company was in immediate need of liquid funds, to make payments on reinsurance contract, and authorizing the secretary to arrange for the sale of all of the company's mortgages. One of

the defendants testified that the real purpose of disposing of the stock was to reinsure and protect the company, because of the frozen condition of the bank account, which, at the first of the year, was about $460,000; that they were impressed that, if they made a sale, they must make it to one who had ready funds with which to take care of the reinsurance. A statement given by Tonne to Gardner, March 1, 1921, showed capital and surplus $211,598.44 (or surplus $11,598.44).

The Interstate Company's report, June 20, 1921, apparently made for the year ending December 31, 1920, showed an impairment of capital of $50,837.32, but a surplus, as regards policyholders, of $149,162.18. Both bank deposits were apparently figured in this report at face value. It is said that the evidence does not show that the company was indebted, or the amount of its indebtedness, when the arrangements in question were made. We think it is obvious, however, from what has been recited, that the defendant was carrying a large policy liability; and defendants recognized the fact that the company's funds in the Iowa Savings Bank, which defendants claim was insolvent, were not forthwith available; that they were under the necessity of either raising money by selling more stock, or of effecting reinsurance, or of making further contributions to surplus. Over $600,000 of claims have been allowed. As has been stated, the claims were running from $45,000 to $50,000 per month. It cannot be assumed that the policy liabilities were, under these circumstances, incurred in any extraordinary amount after May 9, 1921, the date when defendants took the checks. Though the company could not get reinsurance (as defendants say), because it required $100,000, and the Iowa Savings Bank could not pay it, the company had $97,500 on deposit in the Des Moines National Bank. The only reason given for what was done is that Gardner would not take the bank deposit. The defendants took and used the $97,500, a good cash asset that would otherwise have been available to policyholders, or for reinsurance. While the defendants say that the purpose of the contract was to have liquid assets in the bank, and they do not concede that the Interstate Company was insolvent, defendants appropriated to their stock the $97,500. The evidence seems to be clear that, before defendants took the checks, they had lost confidence in Gardner, so far as his carrying out his

contract with them was concerned. Nevertheless, they were willing to rely on him to carry out, after they had retired with the $97,500 and the $250,000, his further agreement to furnish $100,000 to surplus available for reinsurance, and they accepted for the company the Gardner Company's "emergency arrangement," by which the temporary securities would be taken down, "and mortgages, cash or bonds put in their place in the next 60 days, all according to what our future program turns out to be." One defendant testified that, before signing the contract, he asked Gardner if he had funds to obtain reinsurance and protect the interest of the stockholders and policyholders, "and he turned a little red in the face, and said 'Do you think I am a damn fool,—buying something I couldn't pay for?' * * * Our stock is worth on the market $125 per share." This defendant testified that Gardner said that the Gardner Company was paying substantial dividends, and had on hand "what he termed liquid assets" in the neighborhood of $600,000 that were available to put into this proposition, and with which reinsurance could be produced; that Gardner said that their syndicate had always been able to command such assets as they wanted from the Great American. Storjohann testified that the president of the Western Alliance Company, with probably $350,000 capital and $250,000 surplus, "with very little business on the books," informed defendants that:

"It was proposed to merge it with the Interstate, * * * after the merger he would declare a 60 per cent dividend, which would be notes of insurance companies and funds readily admitted by any insurance department and readily used for reinsurance purposes; but it was his plan that he would relieve both companies of all liability, as far as insurance was concerned; they would all be reinsured, and put on a clean footing. * * * I was informed that, if he was going to give us this additional collateral, he would necessarily have to have a little more time than the original contract provided for, in order that he might carry out this merger plan. * * * He procured the $131,000.09 of collateral notes from his safe, and asked that the stock be issued to him,— that is, the balance of the 1,325. * * * The understanding for April 8th, when we got those securities which satisfied us that this contract of February 28th was going to be carried out, was

that thereafter we would do what Gardner wanted done, in carrying out the plans."

On February 11, 1921, Gardner had wired Tonne that:

"I cannot pay for reinsurance myself and stock also at this time and wait for reimbursement but will pay for reinsurance if you take pay for stock as bank releases deposit."

The project contemplated payment in securities acceptable to the insurance department, and substitution of them so far as necessary for the frozen account. This was not done.

We are of the opinion that the defendants must be held to have sustained a trust relationship to the creditors of the corporation. *Hibernia Bank & Tr. Co. v. Succession of Cancienne,* 140 La. 969 (74 So. 267, 269); *Wilkinson v. Bauerle,* 41 N. J. Eq. 635 (7 Atl. 514). While the Interstate Company is not conceded to have been insolvent, it manifestly was functioning with difficulty, and in November, 1921, went into the hands of a receiver. The purpose of state supervision and of the efforts that were made to add to the surplus was to assure ability to pay losses and other obligations and running expenses in the ordinary course of business. A primary duty of the defendants', under the law, was to protect the policyholders. They recognized that duty. Their claim, in effect, is that such protection and the substitution of liquid assets for the frozen bank account constituted the end in view in making sale of their stock. The rights of policyholders accrued from the dates of their contracts. Insurance policies run for considerable periods of time, and premiums are paid in advance. The surplus was required for policyholders, and the requirement that it be furnished assumes the existence of liabilities. It would be unreasonable to hold, on this record, that the existence of liabilities to policyholders on May 9, 1921, is not shown. Undoubtedly, the defendants had no actual fraudulent intent or purpose of defeating creditors. Their claim is that they acted in entire good faith, and obtained Gardner's agreement to provide surplus, but that Gardner did not perform his agreement, and that the troubles of the company are due to Gardner's default, and not to their breach of duty. It is clear, we think, that the defendants did not trust Gardner's agreements with themselves, when or so far as their interests were involved. The secretary, Tonne, testifies:

"I broached the subject of the escrow agreement. At that time he had already put in $50,000. He had $50,000 worth of stock at the basis at which he purchased it, and we wanted further assurance. There was further conversation between Gardner, Storjohann, and myself at that time. Storjohann and I wanted further guarantees as to his carrying out the contract. Our reason was that, after a month since he had paid his $50,000, we didn't feel that for that investment of $50,000 for which he had stock he should have the full approval of handling the company, unless we knew he had further investments. We had a plant that had been a success, and the reputation of the company was worth considerable, and I wanted to feel that he had enough invested so that he could go through with his deal with the company."

He says that the previous payment of $50,000 readily made in good securities inspired at that time confidence. The $50,000 was, however, a comparatively small part of the $397,500, or of that plus the price of the minority stock. It appears that in the assets of the Interstate Company are the notes of the Gardner Company, stock in that company, the miscellaneous list of notes above referred to, and the stock in the automobile company formerly belonging to defendants. The Gardner Company notes, amounting to $100,000, are shown on the ledger as contributed to surplus July 31, 1921. A former employee of the Inter-State Company testifies that personally he never made any effort to collect the notes; that he thought at one time there was a circular letter sent out; that there were evidently some responses; that he recalled seeing the letter of one of the parties sent back to him by Gardner, advising him not to pay the note. The receiver testifies that one or more of the Gardner notes are in default; that he figures them poor. The Interstate Company has been divested of the $97,500 of cash in the Des Moines National Bank, of the $250,000 in the Iowa Savings Bank (which, to all intents and purposes, has, on the record here, been paid). Gardner was obviously a promoter and speculator, relying on the successful consummation of proposed consolidations, and on declaring and utilizing a 60 per cent promoters' dividend. While the defendants had no thought of actively injuring creditors or perpetrating any wrong, it must be said that they did not exer-

cise, in their trust capacity, the same care and diligence, and use the same precautions, that they thought necessary to use in their own interests in the same transactions.. They trusted, after they got the checks, to Gardner's mere agreement to arrange for proper surplus for the company. The directors, except Bradley and Maloney, continued as such until the transactions in controversy were consummated. Bradley and Maloney were parties to the original contract. Their resignation was in performance of their agreement, and for the purpose of putting Gardner in control. They have received and are retaining the benefit of the later agreements. In fact, one of them procured (though he claims unwittingly) the Gardner Company's indorsements of the checks. It was the action of the defendants in their capacity of directors of the company that has brought to their possession and enjoyment the company's funds, and brought to the company an apparent depletion of assets. The defendants cannot be heard to say in defense that they were acting merely at the behest of Gardner, or that the wrong sustained by the company was the wrong of Gardner,. and not of themselves; nor can they shift responsibility to the insurance commissioner, for the result of their official action. See *Globe Woolen Co. v. Utica Gas & Elec. Co.*, 224 N. Y. 483 (121 N. E. 378). We may add that the record does not show but that VanNest still holds his stock, to the amount of $12,500 par value. It is not shown that he consented to the transactions under review. The receiver represents both stockholders and creditors. 14a Corpus Juris 990. That directors sustain a fiduciary relation to stockholders is conceded. The policy of the law is to put fiduciaries beyond the reach of temptation, by making it unprofitable for them to yield to it. To that end, an act by the fiduciary in which personal interest and duty conflict, is voidable at the mere option of the beneficiary, regardless of good faith or results. The court will not inquire into its profitableness to the trustee or prejudice to the beneficiary. This rule is applicable to the acts of boards of directors. *Hibernia Bank & Tr. Co. v. Succession of Cancienne*, 140 La. 969 (74 So. 267, 269); *Coleman v. Second Avenue R. Co.*, 38 N. Y. 201; *Alabama Fid. Mtg. & Bond Co. v. Dubberly*, 198 Ala. 545 (73 So. 911); *O'Conner Min. & Mfg. Co. v. Coosa Furnace Co.*, 95 Ala. 614 (10 So. 290); *Sausalito Bay Land Co. v. Sausalito Imp. Co.*, 166 Cal. 128 (136 Pac. 57);

*DeMoulin v. Magnesite R. Co.,* 186 Cal. 128 (199 Pac. 42) ; *Curtin v. Salmon River H. G. M. & D. Co.,* 130 Cal. 345 (62 Pac. 552) ; *Corsicana Nat. Bank v. Johnson,* 251 U. S. 68 (64 L. Ed. 141, 155) ; 2 Cook on Corporations (6th Ed.), Section 652. *Buell v. Buckingham & Co.,* 16 Iowa 284, does not establish a different rule. If the contract belonged to that class which, under the necessities of the case, when fair, will be sustained, still the burden of proving fairness is upon the directors, and the defendants have not successfully sustained that burden. 2 Thompson on Corporations (2d Ed.), Sections 1225 to 1227; *Twin-Lick Oil Co. v. Marbury,* 91 U. S. 587.

The defendants, whose only rights in the property of the corporation were subordinate to the liabilities to creditors, are attempting to maintain the position of having the superior title to the funds of the company, and to the amount (nominally at least) of $347,500. The evidence that the defendants and the minority stockholders got the same price for their stock, $200 per share, would indicate that the defendants computed the stock at $200, and the surplus at $100 per share, thereby getting back their contribution to the surplus in full. If the $50,000 paid in securities is deducted, defendants are in the position of getting out of the bank accounts of the company approximately $150 per share for their stock of the par value of $100. The stock which they had now appears in the assets of the company (as collateral) left for the creditors. It is obviously now of no value to them.

Without further relation of or comment on the facts, it is sufficient to say that the appropriation of the bank accounts by defendants to the payment of the price of their stock on the sale to Gardner was constructively fraudulent as to creditors. *Luedecke v. Des Moines Cab. Co.,* 140 Iowa 223. See Code of 1897, Section 1621. Defendants suggest a liability of the company to them for the amount contributed to surplus. The only evidence is to the effect that the funds furnished were a contribution. There is no basis for holding the company liable for it. See *In re Estate of Prunty,* 201 Iowa 670, and cases cited.

It is claimed that plaintiff has not restored the *status quo.* Restoration is tendered in the petition, and was offered at the taking of testimony. This is sufficient, in equity. We are aware

that our conclusions may result in very serious consequences to defendants, notwithstanding their freedom from evil motives. To sustain, however, their dealings with the company would be subversive of elementary principles governing fiduciary relationships in general and the management of corporations in particular, and would open the door to the grossest frauds by corporate managers.

We are of the opinion that the judgment is right, and it is —*Affirmed.*

EVANS, C. J., and STEVENS, DE GRAFF, ALBERT, and KINDIG, JJ., concur.

## SUPPLEMENTAL OPINION.

MORLING, J.—The very earnest argument made by defendants in support of petition for rehearing has had the consideration of the court in re-examination of applicable equitable principles and authorities.

That the policyholder is a creditor from the date of his policy, see *In re Assignment of Rea,* 82 Iowa 231, 238; *Nichols v. Harsh,* 202 Iowa 117; *Gallagher v. Asphalt Co. of Am.,* 65 N. J. Eq. 258 (55 Atl. 259, 260) ; *Herrick v. Wardwell,* 58 Ohio St. 294 (50 N. E. 903, 906) ; *Graeber v. Sides,* 151 N. C. 596 (66 S. E. 600) ; *Carr v. Davis,* 64 W. Va. 522 (63 S. E. 326, 328) ; *Brown v. Hitchcock,* 36 Ohio St. 667, 678; 27 Corpus Juris 472, 473; *Frye v. Chicago, R. I. & P. R. Co.,* 157 Minn. 52 (195 N. W. 629).

That the corporation, at the time of the withdrawal of funds, did not measure up to the statutory requirement for solvency, see Code of 1897, Sections 1714, 1731; *Chicago Life Ins. Co. v. Auditor of Public Accounts,* 101 Ill. 82; and cases post.

That the relationship of defendants to the corporation and to the holders of policies then outstanding, and in contemplation of solicitation and procurement in the intended continued prosecution of the business, was, in essence, fiduciary, and that defendants' withdrawal of corporate funds and their appropriation thereof to the payment of the price of their stock was, in the eye of equity, fraudulent as to existing and prospective policyholders, see *Oliver v. Brennan,* 292 Fed. 197, 201; same

case on appeal, 299 Fed. 106, 109; *Couse v. Columbia Powder Mfg. Co.* (N. J. Ch.), 33 Atl. 297, 299; 14a Corpus Juris 905; *Consolidated Tank Line Co. v. Kansas City Varnish Co.,* 45 Fed. 7; *Atlanta & Walworth B. & C. Assn. v. Smith,* 141 Wis. 377 (123 N. W. 106, 108); *Corey v. Wadsworth,* 99 Ala. 68 (11 So. 350, 23 L. R. A. 618, 42 Am. St. 29); *Johnson v. Canfield-Swigart Co.,* 292 Ill. 101 (126 N. E. 608); *McIver v. Young Hdw. Co.,* 144 N. C. 478 (57 S. E. 169); 14a Corpus Juris 885, 896, 905; *Bosworth v. Allen,* 168 N. Y. 157 (61 N. E. 163); *Gilbert v. Finch,* 173 N. Y. 455 (66 N. E. 133); 2 Cook on Corporations (6th Ed.) 2083, 2087, Section 682; *Gantenbein v. Bowles,* 103 Ore. 277 (203 Pac. 614); 7 Ruling Case Law 760; *Olney v. Conanicut Land Co.,* 16 R. I. 597 (18 Atl. 181, 27 Am. St. 767, 5 L. R. A. 361); *In re Shotwell,* 43 Minn. 389 (45 N. W. 842, 844); 3 Words & Phrases 2947; *Bradley v. Converse,* 4 Clif. (U. S.) 375; *Dickinson v. Stevenson,* 142 Iowa 567, 570; *Jackson v. Ludeling,* 21 Wall. (U. S.) 616, 624. See quotation from this case in *Dawson v. National Life Ins. Co.,* 176 Iowa 362, 385:

" 'Managers and officers of a company where capital is contributed in shares are, in a very legitimate sense, trustees alike for its stockholders and its creditors, though they may not be trustees technically and in form. They accordingly have no right to seek their own profit at the expense of the company, its shareholders, or even its bondholders.' "

See, also, *Hibernia Bank & Tr. Co. v. Succession of Cancienne,* 140 La. 969 (74 So. 267, 269, L. R. A. 1917D 402; *Barhydt & Co. v. Perry,* 57 Iowa 416, 419; *Paulk v. Cooke,* 39 Conn. 566; *O'Neill v. Kilduff,* 81 Conn. 116 (70 Atl. 640, 642); *Savage v. Murphy,* 34 N. Y. 508 (90 Am. Dec. 733); *Spuck v. Logan & Uhl,* 97 Md. 152 (54 Atl. 989, 99 Am. St. 427); *Rudy v. Austin,* 56 Ark. 73 (19 S. W. 111, 35 Am. St. 85); *Lander v. Ziehr,* 150 Mo. 403 (51 S. W. 742, 73 Am. St. 456); *Crowley v. Brower,* 201 Iowa 257; *Brundage v. Cheneworth,* 101 Iowa 256. For a very complete and persuasive discussion of fiduciary relationships, the reasons underlying the establishment of their existence, and their effect, see *Dawson v. National Life Ins. Co.,* 176 Iowa 362.

Petition for rehearing overruled.